UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

DAVID PIRK, ANDRE JENKINS, a/k/a
Little Bear, TIMOTHY ENIX a/k/a Blaze,
FILIP CARUSO a/k/a Filly, JASON WILLIAMS
a/k/a Toop, GREGORY WILLSON a/k/a Flip,
ROBERT OSBORNE, JR., STANLEY
OLEJNICZAK, JACK WOOD a/k/a Jake a/k/a
Snake, THOMAS SCANLON a/k/a Tom, GLEN
STACHARCZYCK a/k/a Turbo, and SEAN
MCINDOO a/k/a Professor,

Defendants.

---

**DECISION AND ORDER**

1:15-CR-00142 EAW



## **INTRODUCTION**

The above-captioned matter involves eight remaining defendants[1] (collectively,

"Defendants") named in a 46-count Second Superseding Indictment (Dkt. 33)

("Indictment") returned on March 16, 2016, alleging various crimes, including a

conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act, 18

U.S.C. §§ 1961 *et seq.* ("RICO"), in connection with the operation of the Kingsmen

---

[1]    Eight defendants—Edgar Dekay, II a/k/a Ed a/k/a Special Ed (Dkt. 412), Thomas
Koszuta a/k/a Kazoo (Dkt. 296), Emmett Green (Dkt. 257), Ryan Myrtle (Dkt. 330),
Gregory Willson (Dkt. 892), Thomas Scanlon (Dkt. 947), Robert Osborne, Jr. (Dkt. 976),
and Sean McIndoo—have pleaded guilty.  When the Court announced its decision on the
motions for severance, Willson, Scanlon, Osborne, and McIndoo had not pleaded guilty.
Because the circumstances of Willson, Scanlon, Osborne, and McIndoo influenced the
Court's rationale, this Decision and Order discusses their motions, even though those
defendants will no longer proceed to trial.

Motorcycle Club ("KMC").  Among the overt acts of the alleged conspiracy are the execution-style murders of two KMC members—Paul Maue ("Maue") and Daniel "DJ" Szymanski ("Szymanski")—that occurred outside the KMC North Tonawanda Chapter clubhouse during the early morning hours of September 6, 2014.  (*See* Dkt. 33, Count 1, Overt Acts ¶¶ 41-66).  Defendant Andre Jenkins was convicted for the murders in state court, following a jury trial.

This Decision and Order addresses the motions for severance and for change of venue filed by defendants David Pirk ("Pirk") (Dkt. 434; Dkt. 435; Dkt. 789; Dkt. 833); Filip Caruso ("Caruso") (Dkt. 776); Jack Wood ("Wood") (Dkt. 777); Stanley Olejniczak ("Olejniczak") (Dkt. 781; Dkt. 784); Gregory Willson ("Willson") (Dkt. 782); Sean McIndoo ("McIndoo") (Dkt. 783); Glen Stacharczyck ("Stacharczyck") (Dkt. 785); Robert Osborne, Jr. ("Osborne") (Dkt. 787); Timothy Enix ("Enix") (Dkt. 790); Thomas Scanlon ("Scanlon") (Dkt. 791); and Andre Jenkins ("Jenkins") (Dkt. 522; Dkt. 792; Dkt. 836).  For the reasons set forth below, the Court severs Caruso, Wood, Stacharczyck, and Jason Williams ("Williams") from the trial commencing on January 16, 2018, and determines that that trial will take place in Buffalo, New York.

## **BACKGROUND**

In December 2016, four defendants—Scanlon, Osborne, Olejniczak, and Williams—moved for severance.  (Dkt. 384; Dkt. 387; Dkt. 394; Dkt. 400).  In a Decision

and Order dated February 9, 2017, the Court denied those motions without prejudice, reasoning that severance was premature at that time.[2] (Dkt. 490).

In January 2017, Pirk moved to sever his trial from his co-defendants and to change the location of his trial from Buffalo, New York, to Rochester, New York. (*See* Dkt. 434 at 21-27 (motion to change venue); Dkt. 435 (Severance Motion)). Jenkins' pretrial omnibus motion, filed in March 2017, requested a change of venue to another district, or, alternatively, from Buffalo, New York, to Rochester, New York. (Dkt. 522 at ¶¶ 140-46).

In July 2017, the Court issued a Decision and Order on certain aspects of Defendants' pretrial omnibus motions. (Dkt. 688). However, in that Decision and Order, the Court did not address Pirk's motions for severance and to change venue (Dkt. 435; Dkt. 435) or Jenkins' motion for change of venue (Dkt. 522), choosing instead to resolve those motions closer to the time of trial. (Dkt. 688 at 2. n.4). In August 2017, the Court issued a Pretrial Order, which set a deadline of September 15, 2017, for Defendants to file or renew previously filed severance motions. (Dkt. 739 at 2).

Defendants moved or renewed their motions for severance, pursuant to Federal Rules of Criminal Procedure 8 and 14, as listed below:

- David Pirk:
  Motion to Change Venue                        Dkt. 434
  Motion to Sever Defendant and Counts          Dkt. 435
  Renewed Motion to Sever                       Dkt. 789
  Renewed Motion to Change Venue                Dkt. 833

- Filip Caruso:
  Motion to Sever Defendant                     Dkt. 776

---

[2]    At that time, Scanlon had also moved to sever Counts 27 through 30. The Court's Decision and Order dated February 9, 2017, denied that motion with prejudice. (*See* Dkt. 490 at 9-15).

- Jack Wood:                Motion to Sever Defendant                          Dkt. 777

- Gregory Willson:          Motion to Sever Defendant                          Dkt. 782

- Stanley Olejniczak:       Motion to Sever Defendant                          Dkt. 781
                           Amended Motion to Sever Defendant                  Dkt. 784

- Thomas Scanlon:          Motion to Join in Request for Separate Trial       Dkt. 783
                           Motion to Sever Defendant                          Dkt. 791

- Glen Stacharczyck:       Motion to Sever Defendant                          Dkt. 785

- Robert Osborne:          Motion to Sever Defendant, Joinder                 Dkt. 787

- Timothy Enix:            Motion to Sever Defendant                          Dkt. 790

- Andre Jenkins:           Motion to Change Venue                             Dkt. 522
                           Motion to Sever Defendant                          Dkt. 792
                           Motion for Joinder                                 Dkt. 836

On September 29, 2017, the Government filed a consolidated response to Defendants' motions for severance. (Dkt. 803). Some defendants filed replies in further support of their motions. (Dkt. 808 (Pirk); Dkt. 809 (Scanlon); Dkt. 810 (Stacharczyck); Dkt. 811 (Enix); Dkt. 812 (Jenkins)).

On October 24, 2017, the Court held oral argument on the motions for severance and for change of venue cataloged above. (Dkt. 844). After the oral argument concluded, the Court orally announced its decision to sever Caruso, Wood, Stacharczyck, and Williams from the trial commencing on January 16, 2018, to defer ruling on Jenkins' motion for severance, and to deny all other motions for severance.[3] The Court also

---

[3]    The Court initially deferred ruling on Jenkins' motion for severance and to change venue because a question had arisen whether the Court was divested of jurisdiction because Jenkins had filed an interlocutory appeal of the Court's Decision and Order denying his

announced its decision to hold the trial commencing on that date in Buffalo, New York. On October 26, 2017, the Court issued a Text Order summarizing its oral decision and indicating that a forthcoming Decision and Order would memorialize the Court's reasoning in further detail. (Dkt 840). This Decision and Order sets forth that reasoning.

## SEVERANCE

I.    **Defendants' Arguments in Support of Severance**

Caruso, Wood, Willson, Olejniczak, Stacharczyck, and Osborne each argues, in the main, that he should not be tried with co-defendants who are charged with committing or ordering acts of violence, and particularly, those charged with the overt acts of the murders. (*See* Dkt. 776 at ¶¶ 32-39 (Caruso); Dkt. 777 at ¶ 9 (Wood); Dkt. 782 at ¶ 28 (Willson); Dkt. 784 at ¶¶ 8, 12, 14, 19-21 (Olejniczak); Dkt. 785 at ¶ 4 (Stacharczyck); Dkt. 787 at ¶ 5 (Osborne)). These defendants also argue that the admission into evidence of Jenkins' prior state court conviction for the murders would prejudice their rights to a fair trial. (*See* Dkt. 776 at ¶ 28; Dkt. 782 at ¶ 27; Dkt. 784 at ¶ 10; *see also* Dkt. 783).

To those ends, Caruso and Willson both ask to be severed from Pirk, Enix, and Jenkins, arguing that these defendants are the only ones charged in the murders. (Dkt. 776 at ¶ 32 ("[O]nly these defendants [Pirk, Enix, and Jenkins] are charged in the overt acts of murder which would substantially prejudice the right to a fair trial by Caruso who is not

---

motion to dismiss on double jeopardy grounds. (Dkt. 689; Dkt. 699). The appeal remains pending, and oral argument was held on January 9, 2018, before the Second Circuit. However, after the oral argument on October 24, 2017, the Court issued a Decision and Order retaining jurisdiction and concluding that it would proceed to trial with Jenkins on January 16, 2018. (Dkt. 877).

charged in those acts."); Dkt. 782 at ¶ 28 ("The prejudice stemming from the introduction of evidence against Pirk, Enix, and Jenkins—those charged in the murder—would substantially impede the jury's ability to make a reliable judgment.")).  Olejniczak asks not to be tried with Pirk and Jenkins, arguing that, in contrast to those co-defendants, he is not named in the overt acts of violence contained in the introduction to the RICO conspiracy count.  (Dkt. 784 at ¶ 8, 12, 14, 19-21).  Stacharczyck argues that the risk of prejudicial spillover would be too great if he were to be required to stand trial with certain co-defendants (Jenkins, Caruso, Enix, McIndoo, Olejniczak, Pirk, and Willson) who are accused of crimes and acts of violence, including murder.  (Dkt. 785 at ¶¶ 4-7).  Osborne argues that his alleged participation in Count 1 is "minimal," as the Indictment attributes only five overt acts to him.  (Dkt. 787 at ¶ 5).  He argues that, as a "peripheral figure," he should be severed from his co-defendants, or alternatively, that the Court should adopt the "groupings" suggested by Scanlon.  (*Id.* at ¶¶ 8-9).

Scanlon proposes three trial groups as follows:  Group A, consisting of Pirk, Willson, Olejniczak, McIndoo, Caruso, and Enix; Group B, consisting of Williams, Osborne, Wood, Scanlon, and Stacharczyck; and Group C, consisting of Jenkins.  (Dkt. 791 at 8).  According to Scanlon, Group A consists of those accused of ordering or carrying out violent acts, whereas Group B consists of those accused mainly of obstruction of justice and various possession offenses related to narcotics trafficking.  (*Id.*).  Finally, he proposes isolating Jenkins to Group C in order to ensure that Jenkins' state court murder conviction does not unduly prejudice the defendants in Group A, as well as to allow time for Jenkins' state and federal appeals to be resolved.  (*Id.* at 9).  In support of his proposal, Scanlon

- 6 -

argues that a trial of 12 defendants would be unmanageable and in excess of the benchmarks described in *United States v. Casamento*, 887 F.3d 1141, 1141-42 (2d Cir. 1989). *Id.* at 10-12. He disagrees with the notion that the overarching conspiracy count warrants a single trial, pointing out that the Indictment contains several counts that are irrelevant to the RICO conspiracy and charge only certain defendants, and that not all technically relevant evidence is admissible, as it may be cumulative or unduly prejudicial. (*Id.* at 12-13). Like his co-defendants, Scanlon also argues that the admission of Jenkins' certificate of conviction would be extremely prejudicial. (*Id.* at 15-18). According to Scanlon, separating defendants who are charged with serious violence from those who are not would address the foregoing concerns. (*Id.* at 19-23).

McIndoo argues that "there needs to be at least two separate trials, and that actually Mr. Jenkins should be tried separately from all the others." (Dkt. 783). McIndoo disagrees with Scanlon's proposal that McIndoo belonged in the first trial of defendants accused of ordering or carrying out acts of violence, arguing that the violence in which he was allegedly involved was overstated. (*Id.*).

Pirk argues that he should be tried separately from Caruso because Caruso and Pirk have each claimed that the other either committed or caused the murders of Maue and Szymanski, and each claims that the other intended to kill or injure the other. (Dkt. 789 at 3). Pirk also argues that he should not have a joint trial with Caruso because "the government has specifically accused [Caruso of] engineering an assaultive confrontation with Mr. Pirk on August 3, 2014 as an overt act of the RICO conspiracy." (*Id.* at 4). Pirk further argues that a trial with Caruso would violate the principles set forth in *Bruton v.*

- 7 -

*United States*, 391 U.S. 123 (1968). (*Id.* at 5). Pirk maintains that he should be tried separately from Jenkins because the Government's use of Jenkins' state court murder conviction will prejudice Pirk. (*Id.* at 6-9). Like Scanlon, Pirk argues that the Court should not conduct a single trial in light of the number of defendants. (*Id.* at 9-13).

Enix requests that the Court sever the defendants into two or more separate trial groups, as follows:  Group 1, consisting of Enix, Williams, Osborne, Wood, Scanlon, and Stacharczyck; Group 2, consisting of Willson, Olejniczak, McIndoo, and Caruso; and Group 3, consisting of Jenkins and Pirk. (Dkt. 790 at ¶ 7). According to Enix, this proposal would avoid Enix being tried with co-defendants accused of engaging in or ordering violence. (*Id.*). Enix maintains that some co-defendants erroneously read the Indictment to include Enix in the overt acts concerning the murders, but he contends that he is not alleged to have engaged in or ordered violence, including the murders. (Dkt. 790-1 at 3 & n.1). Like Pirk, Enix argues that Jenkins' murder convictions are inadmissible against Enix, and that Caruso should be tried separately from Enix and Pirk because of *Bruton* concerns. (*Id.* at 7-10).

Jenkins argues that, under *Bruton*, the Court should sever his trial from certain co-defendants who purportedly made statements implicating him in the charged offenses. (Dkt. 792 at ¶ 5). Alternatively, he asks that the Court bar admission into evidence of any post-arrest statements, made by non-testifying co-conspirators, that may implicate him. (*Id.*). He identifies statements by Pirk, Enix, Caruso, Williams, Osborne, Wood, Scanlon, Stacharczyck, and McIndoo as implicating him and running afoul of *Bruton*. (*Id.* at ¶¶ 9-12).

## II.    The Government's Arguments

In its consolidated response, the Government argues that severance is not necessary because of the nature of the charged RICO conspiracy, a crime of violence with predicate racketeering activities such as murders, kidnapping, robbery, assaults, drug offenses, obstruction of justice, witness tampering, and sales of untaxed cigarettes. (Dkt. 33, Count 1 at ¶ 28). The Government argues that, because the Indictment charges all Defendants with the RICO conspiracy, the notion that some defendants are more culpable than others is without merit; moreover, in its view, no defendant is a minor player in the conspiracy. (Dkt. 803 at 1-2).

The Government's response also includes some concessions. It consents to the severance of Caruso and Williams but maintains that the "main trial"—to commence before any trial of Caruso and Williams—should include the remaining ten defendants. (*Id.* at 5-7). The Government also indicates that, if the Court "prefer[red] two more evenly balanced groups for trial," the Government would consent to Wood being severed from the main trial. (*Id.* at 37). The Government also states that it would forgo introducing Jenkins' state court conviction during its case-in-chief in order to protect against spillover prejudice and allow Jenkins to be tried jointly with his co-defendants. (*Id.* at 11).

The Government further argues that certain statements cited by Defendants do not implicate *Bruton*, namely, the interview between Enix, Pirk, and the FBI on December 11, 2014. (Dkt. 803 at 16-25). The Government maintains that "all the evidence against Pirk and Jenkins is admissible against Enix, and vice-versa," and as a result, "there is no spillover prejudice, and no reasonable view of the evidence, that should separate defendant

Enix from defendants Jenkins and Pirk at trial." (*Id.* at 28).   The Government disagrees with Jenkins that there are any valid *Bruton* concerns arising out of statements by Pirk, Enix, Caruso, Williams, Wood, Osborne, Scanlon, Stacharczyck, and McIndoo. (*Id.* at 28-31).

Finally, the Government argues that the number of defendants and length of trial do not require a severance, and that its proposed main trial complies with the benchmarks in *Casamento*. (*Id.* at 38-42).

## III.    Rules Governing Joinder and Severance

Rule 8(b) provides for joinder of defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b) ("The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count."). The Indictment plainly alleges a common scheme and conspiracy involving KMC, with all defendants named in the RICO conspiracy count, among others. (*See* Dkt. 33). Thus, Defendants are properly joined pursuant to Fed. R. Crim. P. 8(b). *See United States v. Nerlinger*, 862 F.2d 967, 973 (2d Cir. 1988) (It is an "established rule . . . that a non-frivolous conspiracy charge is sufficient to support joinder of defendants under Fed. R. Crim. P. 8(b).").

Pursuant to Rule 14, "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). The decision to sever a trial

pursuant to Rule 14 is "confided to the sound discretion of the trial court." *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003). A trial court's decision concerning severance is considered "virtually unreviewable," and the denial of such a motion "will not be reversed unless appellants establish that the trial court abused its discretion." *United States v. Cardascia*, 951 F.2d 474, 482 (2d Cir. 1991). In order to successfully challenge the denial of a request for severance, a defendant "must establish prejudice so great as to deny him a fair trial." *Id.*

The party requesting severance must demonstrate substantial prejudice: "When defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *United States v. Astra Motor Cars*, 352 F. Supp. 2d 367, 369-70 (E.D.N.Y. 2005) (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)); *see also Cardascia*, 951 F.2d at 482 (in order to successfully challenge the denial of a request for severance, a defendant "must establish prejudice so great as to deny him a fair trial"); *United States v. Friedman*, 854 F.2d 535, 563 (2d Cir. 1988) ("[T]he defendant must show that he or she suffered prejudice so substantial as to amount to a 'miscarriage of justice.'"). "[D]iffering levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." *United States v. Chang An-Lo*, 851 F.2d 547, 557 (2d Cir. 1988) (citation omitted). "That the defendant would have had a better chance of acquittal at a separate trial does not constitute substantial prejudice." *United States v. Carson*, 702 F.2d 351, 366 (2d Cir. 1983).

- 11 -

There is a powerful presumption in favor of joint trials of defendants indicted together based upon the underlying policies of efficiency, avoiding inconsistent verdicts, providing a "more accurate assessment of relative culpability," avoiding victims and witnesses having to testify repeatedly, and avoiding the random favoring of "the last-tried defendants who have the advantage of knowing the prosecutor's case beforehand." *Richardson v. Marsh*, 481 U.S. 200, 210, 219 n.7 (1987); *see also Cardascia*, 951 F.2d at 482 ("The deference given by an appellate court to a trial court's severance decision reflects the policy favoring joinder of trials, especially when the underlying crime involves a common plan or scheme and defendants have been jointly indicted."). The Second Circuit has instructed that "[c]onsiderations of efficiency and consistency militate in favor of trying jointly defendants who were indicted together," and "[j]oint trials are often particularly appropriate in circumstances where the defendants are charged with participating in the same criminal conspiracy. . . ." *United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003) (citations omitted); *see also United States v. Van Sichem*, No. SS 89 CR. 813 (KMW), 1990 WL 41746, at *1 (S.D.N.Y. Apr. 2, 1990) ("There is a strong presumption in favor of joint trials for jointly indicted defendants, particularly where, as here, the 'crimes charged involve a common scheme or plan.'" (quoting *United States v. Girard*, 601 F.2d 69, 72 (2d Cir. 1979)). Indeed, "[j]oint trials serve the interests of the government, the accused, and the public by eliminating the additional expense and repetition associated with successive prosecutions." *Van Sichem*, 1990 WL 41746, at *1 (*citing United States v. McGrath*, 558 F.2d 1102, 1106 (2d Cir. 1977)). Moreover, it is well settled that a "RICO count itself, 'virtually by definition,' constitutes 'a "series of acts

- 12 -

or transactions" sufficiently inter-related to permit a joint trial of all defendants.'" *United States v. Rastelli*, 653 F. Supp. 1034, 1041 (E.D.N.Y. 1986) (quoting *United States v. Bagaric*, 706 F.2d 42, 69 (2d Cir. 1983)).

Notwithstanding the presumption in favor of joint trials, the Second Circuit has instructed that, in cases involving lengthy trials of more than four months and more than ten defendants, a district judge should abide by certain "benchmarks" in exercising her discretion to sever the trial. *See United States v. Casamento*, 887 F.2d 1141, 1151-52 (2d Cir. 1989); *see also United States v. DiNome*, 954 F.2d 839, 842 (2d Cir. 1992) ("There is no support in caselaw or in logic for the proposition that a lengthy trial, a large number and variety of charges, and numerous defendants violate due process without a showing that the issues were actually beyond the jury's competence.").

## IV.    Application

As stated on the record on October 24, 2017, the Government did not object to severing Caruso, Williams,[4] and Wood from the main trial. Nor did those defendants object to being severed.

### A.    Differing Levels of Culpability Do Not Warrant Separate Trials.

The Court finds unpersuasive Defendants' arguments that they will suffer substantial prejudice if tried alongside co-defendants with purportedly greater culpability as a result of being accused of violent conduct. As discussed above, the Second Circuit

---

[4]      Williams did not file a motion for severance, but, at the appearance before this Court on October 24, 2017, his counsel indicated that Williams had no objection to being severed from the main trial.

has stated that "differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." *Chang An-Lo*, 851 F.2d at 557 (2d Cir. 1988); *see also United States v. Locascio*, 6 F.3d 924, 947 (2d Cir. 1993) ("[J]oint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible."); *United States v. Nersesian*, 824 F.2d 1294, 1304 (2d Cir. 1987) ("That one appellant's role in the conspiracy may have been smaller or less central than that of certain other co-conspirators does not mandate a separate trial."); *Carson*, 702 F.2d at 366-67 ("There is no question that [the defendant] played a less prominent role in the conspiracy than many of his co-defendants. However, differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials.").

Moreover, as the Government emphasizes, Defendants are all charged with the same RICO conspiracy. As a result, evidence of the alleged predicate racketeering activities—including the murders and other crimes of violence—is likely admissible against all defendants. *See, e.g.*, *United States v. James*, 712 F.3d 79, 104 (2d Cir. 2013) ("James argues that jointly trying him with Mallay, who was also charged with two murders with which James was not charged—those of Vernon Peter and Alfred Gobin—caused him prejudice. That evidence, however, was relevant to the racketeering charges against James to prove the formation, existence, and nature of the racketeering enterprise, which involved the murder of individuals to collect on their insurance policies, as well as to show the pattern of racketeering activity."); *United States v. Diaz*, 176 F.3d 52, 103 (2d Cir. 1999) (finding no substantial spillover prejudice where "the evidence in dispute is relevant to the

charges against all RICO defendants because it tended to prove (1) the existence and nature of the Latin Kings and their RICO enterprise; and (2) a pattern of racketeering activity on the part of each RICO defendant by providing the requisite relationship and continuity of illegal activities"); *DiNome*, 954 F.2d at 843-44 ("The typical spillover claim is that evidence admissible against only one defendant is prejudicial to all defendants and that individual trials should have been held to avoid that prejudice. In the present case, however, the evidence in question is relevant to the RICO charges against all defendants and most probably would have been admitted even if defendants had been accorded individual trials." (citation omitted)). In other words, the evidence of violent conduct by co-conspirators, which Defendants argue would create spillover prejudice, would likely be admissible against each of them in a solo trial, just as it would be in a joint trial. As the Second Circuit explained in *DiNome*:

> [T]he government must prove an enterprise and a pattern of racketeering activity as elements of a RICO violation. Proof of these elements may well entail evidence of numerous criminal acts by a variety of persons, and each defendant in a RICO case may reasonably claim no direct participation in some of those acts. Nevertheless, evidence of those acts is relevant to the RICO charges against each defendant, and the claim that separate trials would eliminate the so-called spillover prejudice is at least overstated if not entirely meritless.

*DiNome*, 954 F.2d at 843 (affirming denial of severance in multi-defendant RICO prosecution). Defendants' arguments to the contrary misconstrue the nature of the RICO charge against them.

### B.    Defendants' *Bruton* Concerns are Unpersuasive

In *Bruton v. United States*, 391 U.S. 123 (1968), the Supreme Court held that a defendant is deprived of his Sixth Amendment right to confrontation when the facially incriminating confession of a non-testifying co-defendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the co-defendant. *Id.* at 126; *accord United States v. Lung Fong Chen*, 393 F.3d 139, 148 (2d Cir. 2004) ("In *Bruton*, the Supreme Court held that the Confrontation Clause of the Sixth Amendment prohibits the introduction of the confession of a non-testifying co-defendant that implicates the defendant in a crime.  A court cannot cure the introduction of such a statement through a limiting instruction.").

Later, in *Richardson v. Marsh*, 481 U.S. 200 (1987), the Supreme Court limited the scope of *Bruton*, concluding that the *Bruton* doctrine applies to a co-defendant confession that is "incriminating on its face." *Id.* at 208 ("There is an important distinction between this case [*Richardson*] and *Bruton*, which causes it to fall outside the narrow exception we have created.   In *Bruton*, the co-defendant's confession "expressly implicat[ed]" the defendant as his accomplice.  Thus, at the time that confession was introduced there was not the slightest doubt that it would prove "powerfully incriminating."  By contrast, in this case the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial (the defendant's own testimony)."); *accord Lung Fong Chen*, 393 F.3d at 148 ("In *Richardson v. Marsh*, 481 U.S. 200 (1987), the Court limited the reach of *Bruton* by holding that when a confession is redacted so that it does not facially incriminate the defendant, its admission with a proper limiting instruction does not violate

the Confrontation Clause."). In *United States v. Wilkinson*, 754 F.2d 1427 (2d Cir. 1985), the Second Circuit held that the admission of a statement that did not connect the defendant with the crime could not violate *Bruton* where it did not inculpate him without introduction of further independent evidence:

> A defendant's *Bruton* rights would be violated, however, only if the statement, standing alone, would clearly inculpate him without introduction of further independent evidence. Here that condition does not exist. The Reid statement, without additional independent evidence, does not connect Burch with the crime.

*Id.* at 1435; *see also United States v. Rutigliano*, 614 F. App'x 542, 546 (2d Cir. 2015) ("Because the 'jury would have had to rely on other trial evidence' (rather than Lesniewski's statement by itself) to connect it to Rutigliano, there was no *Bruton* violation."); *United States v. Yarborough*, No. 06-CR-190(A), 2007 WL 962926, at *9 (W.D.N.Y. Mar. 28, 2007) ("The Second Circuit has held that a defendant's *Bruton* rights are violated only if the statement, standing alone, would clearly inculpate him without introduction of further independent evidence." (citation and alterations omitted)).

Because "[t]he [Confrontation] Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted," *Crawford v. Washington*, 541 U.S. 36, 60 n.9 (2004), the admission of a non-testifying co-defendant's confession does not implicate the confrontation rights of the trial defendant when offered for a non-hearsay purpose, *see Tennessee v. Street*, 471 U.S. 409, 413 (1985). *Bruton* does not preclude the admission of statements that are co-conspirator statements in furtherance of the conspiracy under Federal Rule of Evidence 801(d)(2)(E). *See, e.g., United States v. Nouri*, No. 07 Crim. 1029 (DC), 2009 WL 1726229, at *1 (S.D.N.Y. June 17, 2009) (The

. . . statements are not hearsay because they are co-conspirator statements in furtherance of the conspiracy and therefore admissible under Fed. R. Evid. 801(d)(2)(E).  There is no *Bruton* problem because the statements were made in the context of the conspiracy and not in a custodial or post-arrest situation." (citing, *inter alia*, *United States v. DeVillio*, 983 F.2d 1185, 1193-94 (2d Cir. 1993) (no *Bruton* violation where "the statements at issue fall within the purview of Rule 801(d)(2)(E) and were admissible as statements made 'in furtherance of' the conspiracy")).

"[A] non-obvious redaction of a co-defendant's confession to eliminate any references to the defendant will eliminate any Bruton problem."  *United States v. Lyle*, 856 F.3d 191, 203 (2d Cir. 2017) (citing *Gray v. Maryland*, 523 U.S. 185, 195-97 (1998); *Richardson v. Marsh*, 481 U.S. 200, 208-09 (1987)).  The Second Circuit has consistently held as follows:

> [T]he introduction of a co-defendant's confession with the defendant's name replaced by a neutral noun or pronoun does not violate Bruton.  *See, e.g., United States v. Jass*, 569 F.3d 47, 58 (2d Cir. 2009) (noting that operative questions when evaluating *Bruton* claim are "(1) did the redacted statement give any indication to the jury that the original statement contained actual names, and (2) did the statement standing alone otherwise connect co-defendants to the crimes" (internal quotation marks and ellipsis omitted)).  In *United States v. Tutino*, 883 F.2d 1125 (2d Cir. 1989), for example, we affirmed a conviction based in part on a co-defendant's statement that was redacted to reference "others," "other people," and "another person." *Id.* at 1135.

*Lyle*, 856 F.3d at 203-04; *see also United States v. Hawit*, No. 15-CR-252 (PKC), 2017 WL 2271352, at *9 (E.D.N.Y. May 22, 2017) ("In any event, should such *Bruton* issues arise, they can be addressed in advance of trial through the procedure used for all potential *Bruton* statements, which may include revisions or redactions to such statements, as

deemed necessary, pursuant to the Supreme Court's post-*Bruton* decision in *Gray v. Maryland*, 523 U.S. 185, 195-97 (1998).").

Only Pirk, Enix, and Jenkins raise *Bruton* concerns in their motions for severance. (*See* Dkt. 789 at 5 (Pirk); Dkt. 790-1 at 8 (Enix); Dkt. 792 (Jenkins)). In brief, their *Bruton* claims are unpersuasive because the cited statements are either not facially incriminating; co-conspirator statements that are not testimonial; statements offered for a non-hearsay purpose; or statements that can be redacted in order to alleviate the *Bruton* concerns. The Court considers the *Bruton* arguments of Pirk, Enix, and Jenkins in turn.

### 1. *Bruton* Arguments raised by Pirk and Enix

Pirk and Enix both argue that, if they were tried with Caruso, *Bruton* concerns would arise. (*See* Dkt. 789 at 5; Dkt. 790-1 at 8). Because the Court has severed Caruso, the *Bruton* concerns with respect to Caruso are alleviated.

### 2. *Bruton* Arguments raised by Jenkins

#### i. Caruso, Williams, and Wood

Because the Court has severed Caruso, Williams, and Wood, Jenkins' *Bruton* concerns concerning those defendants' statements are also alleviated.

#### ii. December 11, 2014 Statements by Pirk and Enix to FBI

According to the Government, it intends to offer the December 11, 2014, statements by Pirk and Enix to the FBI as co-conspirator statements in furtherance of the conspiracy; in its view, Pirk and Enix made the statements to try to mislead the FBI and falsely blame Caruso for murders committed by Jenkins. (*See* Dkt. 803 at 21 ("[T]he government is not proving that Caruso was the person who killed Paul Maue and Daniel 'DJ' Szymanski but

rather the government is offering such statements as false exculpatory statements in furtherance of the conspiracy by Pirk and Enix in an attempt to blame Caruso for the murders committed by Jenkins, authorized by Pirk, and facilitated by Enix and others."). Indeed, the statements cited by Jenkins (Dkt. 792 at ¶ 9) do not facially incriminate him. *See, e.g.*, *Lung Fong Chen*, 393 F.3d at 148. Accordingly, there are no *Bruton* problems arising out of these statements.

### iii.    Osborne

The fact that Osborne "testified in the grand jury that he had seen Mr. Jenkins in Olean just prior to the murders and then saw him back in Olean just afterwards," (Dkt. 792 at ¶ 9), does not, without introduction of further evidence, incriminate Jenkins. *See, e.g.*, *Wilkinson*, 754 F.2d at 1435. Thus, this statement presents no *Bruton* problem.

### iv.    Scanlon

The Government suggests that Scanlon's statements will be offered as statements of a co-conspirator in furtherance of the conspiracy (in other words, his alleged obstruction of justice before the grand jury was in furtherance of the conspiracy); if admitted as such, the statements are not precluded by *Bruton*. (*See* Dkt. 803 at 30); *see, e.g.*, *Nouri*, 2009 WL 1726229, at *1.

### v.    Stacharczyck

Stacharczyck's statements that he "met Mr. Jenkins at the KMC National Party in Lockport, NY, in August of 2014," and that he "heard that Mr. Jenkins was in Betty's Bar, in Lockport, the night of the murders [they allegedly occurred in the parking lot of Betty's Bar]," (Dkt. 792 at ¶ 9 (brackets in original)), do not incriminate Jenkins without

- 20 -

introduction of other evidence. *See, e.g., Wilkinson*, 754 F.2d at 1435. Thus, they do not violate *Bruton*.

### vi.    McIndoo

McIndoo's statement that he "didn't know [Jenkins] as well as he thought he did" does not incriminate Jenkins on its face; introduction of further independent evidence would be necessary in order to do so. *See, e.g., Wilkinson*, 754 F.2d at 1435. Thus, it does not violate *Bruton*.

### C.    Severance of Certain Defendants is Warranted

Although Defendants' arguments concerning purported differing levels of culpability and *Bruton* are unpersuasive, the Court finds that severance is warranted in order to create manageable trial groups.[6] *See Casamento*, 887 F.2d at 1151-52; *see also DiNome*, 954 F.2d at 842. To that end, the Court's severance decision is motivated by the logical presentation of proof and the in-custody status of certain defendants.

---

[6]    Evidence of Jenkins' state court conviction arguably would be admissible against Jenkins as evidence of predicate acts in a joint trial with his co-defendants, so long as the Court gave proper limiting instructions. *See, e.g., United States v. Pryba*, 900 F.2d 748, 758 (4th Cir. 1990) (trial court did not improperly admit into evidence 15 prior state court convictions of one defendant, which served as predicate acts of RICO conspiracy, where trial judge "took meticulous care to instruct the jury that prior convictions . . . could only be considered predicate acts as to [that defendant]. . . ."); *United States v. Candelario-Santana*, Criminal No. 09-427 (JAF), 2013 WL 209468, at *1 (D.P.R. Jan. 17, 2013) ("A prior judgment of conviction that is firm and final for a state-law offense that is charged as a RICO predicate racketeering act is admissible to prove the defendant's commission of the disputed racketeering act, along with other evidence promised by the government."). However, as discussed above, the Government has stated that it will forgo introducing Jenkins' state court conviction as part of its case-in-chief to ameliorate any concerns about spillover prejudice and to permit Jenkins to be tried with his co-defendants. (*See* Dkt. 803 at 15).

Pirk, Enix, and Scanlon are allegedly the three highest-ranking members of the KMC based on the allegations in the Indictment. Based on the Government's allegations and the Court's understanding of the evidence, both Pirk and Jenkins should be tried together as they are both charged with counts of racketeering based on the murders. Moreover, Enix was allegedly Pirk's second-in-command, and through Facebook postings was Pirk's alleged spokesperson, including allegedly engaging in communications to facilitate the planning and subsequent cover-up of the murders. Thus, all three (Pirk, Enix, and Jenkins) should be logically tried together. In addition, Scanlon and Osborne both served in leadership roles within the KMC, including each serving at different times as President of the Olean Chapter. (Dkt. 33 at 8). Willson and Olejniczak are both alleged to have been KMC Nomads (a KMC member who answers only to the National President or Regional Presidents and is expected to serve the interests of the KMC, including through violent acts) and were allegedly involved in the June 7, 2013, shutdown of the Springville Chapter KMC clubhouse. (*Id.* at 3, 8-9, 16-17). Willson and McIndoo are both alleged to have been involved in an incident on August 3, 2013, at the Springville KMC Chapter clubhouse, where a shotgun was fired. (*Id.* at 18-19). Moreover, as the Government stated at oral argument on October 24, 2017, its view is that all of the defendants—except for Caruso, Williams, and Wood—have either a direct or indirect connection to the murders. Considering their leadership positions within the KMC and the overlap of proof that will be presented, a trial of Pirk, Enix, Jenkins, Scanlon, Willson, Osborne, Olejniczak, and McIndoo is logical.

Moreover, certain defendants—including Wood, Williams, Stacharczyck—have been released pending trial. (Dkt. 103 (Order setting conditions of Stacharczyck's release); Dkt. 144 (Order setting conditions of Wood's release); Dkt. 162 (Order setting conditions of Williams' release)).  In deciding whether to grant a motion to sever, courts sometimes consider the fact that certain defendants are in custody pending trial, while others are not. *See United States v. Upton*, 856 F. Supp. 727, 736-37 (E.D.N.Y. 1994) (finding severance of some defendants was justified, and noting that "[s]everance will also help prevent defendants from sitting through months of trial, which causes severe disruption to employment and home life, or, if detained, causes prolonged incarceration while defendants are presumed innocent"); *United States v. Stockman,* No. 09–cr–50029, 2010 WL 959928, at * 1 (D.S.D. Mar. 12, 2010) (granting a motion to sever when the defendant had been in pretrial custody for eight months and his co-defendant was ill).  *But see, e.g., United States v. Lockwood*, No. 11-CR-085, 2012 WL 6204194, at *4 (W.D.N.Y. Dec. 12, 2012) ("Defendant's incarceration alone will not support a claim of prejudice sufficient to warrant severing him from the other defendants in this case."); *United States v. Astra Motor Cars,* 352 F. Supp. 2d 367, 370 (E.D.N.Y. 2005) (holding that incarceration alone is not a factor addressed by either Rule 8 or Rule 14); *United States v. Minaya*, 395 F. Supp. 2d 28, 41 (S.D.N.Y. 2005) ("Although the Court is concerned to minimize periods of pre-trial detention, it does not find this consideration to warrant severance of Martinez's trial at this point.  In any multi-defendant case in which the defendants have been denied bail, it is almost inevitable that the period of pre-trial detention will be longer than in an action involving only one defendant."); *United States v. El–Gabrowny*, No. S3 93 Cr. 181

(MBM), 1994 WL 62814, at *2 (S.D.N.Y. Feb. 23, 1994) (rejecting argument that severance was warranted because the defendant had been imprisoned, and absent a severance, he would remain incarcerated for over two years). However, because the proof is logically connected among those defendants who are in custody—in addition to Scanlon and Enix—it makes sense, in the Court's view, to try Pirk, Enix, Jenkins, Scanlon, Willson, Osborne, Olejniczak, and McIndoo together. The only remaining in-custody defendant is Caruso, but trying him with at least some of these defendants would present challenges for the reasons outlined above. In addition, Caruso is incarcerated due to a 46-month prison sentence imposed in another case. (*See* W.D.N.Y. 1:14-CR-00203 RJA HKS (Dkt. 47)).

For these reasons, the Court severs Caruso, Wood, Williams, and Stacharczyck from the main trial commencing January 16, 2018.

## CHANGE OF VENUE

### I.    Defendants' Arguments in Support of Change of Venue

Pirk moves to change venue or the juror division within the district of his trial, on the basis that "the populace of Erie and Niagara counties has been subject to an intense and prolonged barrage of media coverage regarding the 'Kingsmen Slaying.'" (Dkt. 434 at ¶¶ 76-94). He argues that "[t]he extensive coverage regarding the trial of Jenkins, who was convicted at the state trial was particularly and unfairly prejudicial against Mr. Pirk depicting him as the motivating force behind the shootings." (*Id.* at ¶ 82). He also suggests that the Government has contributed to the press coverage because, for example, an AUSA is quoted in the article as stating, "'This indictment charges the worst of the worst'" (*id.* at ¶ 86), and, on August 8, 2016, the then-U.S. Attorney for the Western District of New York

issued a press release concerning a co-defendant's guilty plea in which the KMC was described as "'nothing other than a criminal front'" (*id.* at ¶ 87). In Pirk's view, while the media coverage of the Jenkins trial was intense in Erie and Niagara counties, the media coverage in Rochester area has been sparse. (*Id.* at ¶ 88). Pirk cites both the Sixth Amendment and Federal Rule of Criminal Procedure 21(a) in support of his motion. (Dkt. 434 at ¶¶ 89-90).

In support of his initial motion to change venue, Pirk attaches articles from the *Buffalo News* covering the Jenkins state court proceedings and contends that television and newspaper coverage in the Erie County and Niagara County regions was also extensive. (*Id.* at ¶ 79). Those articles span 95 pages of text. (*See* Dkt. 434-5). In support of his renewed motion to change venue, which was filed on October 23, 2017, Pirk provides a *Buffalo News* article dated October 17, 2017, which described a newly filed indictment of four additional KMC members.[7] (Dkt. 833 at ¶ 12). That article included Pirk's mugshot, along with a reference to Jenkins' state court conviction. (Dkt. 833-1 at 3-4).

Jenkins, also citing the Sixth Amendment and Rule 21(a), argues that his previous state court prosecution "[a]lmost immediately . . . became a major media affair," where the

---

[7]    Pirk's renewed motion to change the location of the trial also objected to certain comments made by AUSA Tripi that were quoted in the *Buffalo News* article, including the following statement: "I would argue that is organized crime at its best." (Dkt. 833 at ¶ 13). In a similar vein, Jenkins sought an order, pursuant to Local Rule of Criminal Procedure 23(c), restraining the Government from speaking to any member of the press. (Dkt. 836). As discussed at oral argument on October 24, 2017, AUSA Tripi did not make statements to the press; rather, he made statements in open court that the press quoted. Accordingly, the motion to restrain the Government was denied as moot because it was withdrawn. (*See* Dkt. 840).

"press coverage was extensive and highly prejudicial." (Dkt. 522 at ¶ 144). He argues that, because of the extremely prejudicial media coverage during his state trial, the Court should move the trial to another district. (*Id.* at ¶ 146). As an alternative solution, he joins in Pirk's request to move the trial from Buffalo to Rochester. (*Id.* at ¶¶ 144-45).

## II.     The Government's Arguments

The Government argues that the Court should deny Pirk's motion to transfer the case to Rochester, whether considered under Federal Rules of Criminal Procedure 18 or 21, or the Local Rules of Criminal Procedure. (Dkt. 491 at 30-31). The Government contends that substantial publicity, in and of itself, is insufficient to require a change of venue under Rule 21(a).[8] (Dkt. 491 at 32). In the Government's view, pretrial publicity is not unique in a so-called "high profile" case, nor is it reasonable, in the internet age, to expect that jurors will not have some exposure to information about a high profile case. (*Id.* at 32-33). Moreover, the Government argues, the critical requirement is that a juror be impartial, not ignorant. (*Id.* at 33). The Government also argues that, before voir dire, the defense cannot establish that any juror has fixed opinions about the case; as a result, a motion for change of venue based on pretrial publicity is premature. (*Id.* at 33-34). The Government notes that the Buffalo division of the Western District of New York has a

---

[8]     The Government additionally argues that Pirk failed to show that a transfer to Rochester was warranted under Rule 21(b), for the following reasons: (1) the Government has not consented to such a transfer; (2) Pirk has not shown that a transfer would be for the convenience of any witness; and (3) the motion is premature. (Dkt. 491 at 36). However, neither Pirk nor Jenkins appeared to rely on Rule 21(b); instead, both cited Rule 21(a), which discusses transfer of a trial "for prejudice" rather than "for convenience." (*See* Dkt. 434 at ¶¶ 89-90; Dkt. 522 at ¶ 144).

population of over 1.5 million people and geographic area of 6,439 square miles. The size of the Buffalo division, according to the Government, should mitigate against any concerns about unfair prejudice, as many potential jurors may not be familiar with the press coverage. (*Id.* at 34-35).

The Government also raises challenges to Jenkins' motion for a change of venue that are similar to those that the Government raises against Pirk. (*See* Dkt. 554 at 67-71). In the main, the Government argues that Jenkins has failed to demonstrate that pretrial publicity will corrupt his trial. (*Id.*).

## III.    Rules Regarding Venue

### A.    Sixth Amendment

"The Sixth Amendment secures to criminal defendants the right to a trial by an impartial jury." *Skilling v. United States*, 561 U.S. 358, 377 (2010); *see* U.S. Const. amend. VI. Although the Constitution provides that criminal trials "shall be held in the State where the . . . Crimes . . . have been committed," U.S. Const. art. III, § 2, cl. 3 & amend. VI, "[t]he Constitution's place-of-trial prescriptions . . . do not impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial—a 'basic requirement of due process.'" *Skilling*, 561 U.S. at 378 (*quoting In re Murchison*, 349 U.S. 133, 136 (1955)).

Where, before jury selection, a defendant raises a constitutional challenge to the venue of his trial, he "must make a showing of presumed prejudice, arising when 'prejudicial publicity so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from that community.'" *United States v.*

- 27 -

*Volpe*, 42 F. Supp. 2d 204, 216 (E.D.N.Y. 1999) (quoting *Mayola v. Alabama*, 623 F.2d 992, 997 (5th Cir. 1980)). "The courts have rarely found such prejudice." *Id.*

An example of a case in which there was presumed prejudice stemming from pretrial publicity is *Rideau v. Louisiana*, 373 U.S. 723 (1963). In that case, a local television station broadcast the defendant's taped confession to murder, kidnapping, and armed robbery to audiences of 24,000 to 53,000 people. *Id.* at 724-25. The parish in which the defendant was tried had a population of approximately 150,000 people. *Id.* at 724. The Supreme Court held that, under those circumstances, the trial court should have granted the defendant's motion for change of venue before jury selection because "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle [of the taped and televised confession] could be but a hollow formality." *Id.* at 726.

In a more recent case, *Skilling*, the Supreme Court commented on *Rideau* and similar cases following it: "In each of these cases, we overturned a conviction obtained in a trial atmosphere that was utterly corrupted by press coverage; our decisions, however, cannot be made to stand for the proposition that juror exposure to news accounts of the crime alone presumptively deprives the defendant of due process." *Skilling*, 561 U.S. at 380 (2010) (citations and alterations omitted). "A presumption of prejudice, [the Supreme Court's] decisions indicate, attends only the extreme case," where the "trial atmosphere . . . was utterly corrupted by press coverage." *Id.* at 380-81 (internal quotation marks, citations, and brackets omitted). "Qualified jurors need not . . . be totally ignorant of the facts and issues involved." *Murphy v. Florida*, 421 U.S. 794, 799-800 (1975); *see also Skilling*, 561 U.S. at 360 (holding that "juror *impartiality* does not require *ignorance*"). "Indeed, among

- 28 -

Supreme Court decisions, *Rideau* stands alone as the only one in which the Supreme Court has 'found presumptive prejudice deriving solely from pretrial publicity.'" *United States v. Ayala*, 64 F. Supp. 3d 446, 450 (E.D.N.Y. 2014) (quoting *Volpe*, 42 F. Supp. 2d at 216).

## B.    Federal Rule of Criminal Procedure 18

Federal Rule of Criminal Procedure 18 provides for the place of prosecution and trial, as follows:

> Unless a statute or these rules permit otherwise, the government must prosecute an offense in a district where the offense was committed. The court must set the place of trial within the district with due regard for the convenience of the defendant, any victim, and the witnesses, and the prompt administration of justice.

Fed. R. Crim. P. 18; *see also United States v. Reed*, 773 F.2d 477, 479–80 (2d Cir. 1985) ("Fed. R. Crim. P. 18 provides that venue in federal criminal prosecutions lies in the district in which the alleged crime was committed. This rule was derived from the constitutional venue provisions."). The Second Circuit has observed that "Rule 18 was amended in 1966 to eliminate an earlier requirement that the trial take place in the district and *division* where the crime occurred." *United States v. Fernandez*, 480 F.2d 726, 730 (2d Cir. 1973). "Both the Sixth Amendment and the first sentence of Rule 18 speak of a right to trial in the *district* where the crime occurred. . . ." *Id.* "[W]hen a district is not separated into divisions, . . . trial at any place within the district is allowable under the Sixth Amendment and the first sentence of F.R.Cr.P. 18." *Id.*

Relatedly, under Local Rule of Criminal Procedure 7, "each criminal case is assigned to a Judge in either Buffalo . . . or Rochester," and "[t]he assignment within these areas shall ordinarily be by random selection." L.R. Crim. P. 7. Further, Local Rule 7

provides that the Court may transfer a case within a district "*sua sponte*" and a party may file a motion requesting such a transfer. *Id.*

### C.     Federal Rule of Criminal Procedure 21

Federal Rule of Criminal Procedure 21(a) provides that, "[u]pon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a).  In keeping with the amendments to Rule 18, the 1966 Amendments to Rule 21 eliminated references to "divisions":

> All references to divisions are eliminated in accordance with the amendment to Rule 18 eliminating division venue.  The defendant is given the right to a transfer only when he can show that he cannot obtain a fair and impartial trial at any place fixed by law for holding court in the district.  Transfers within the district to avoid prejudice will be within the power of the judge to fix the place of trial as provided in the amendments to Rule 18.

Fed. R. Crim. P. 21 advisory committee's note to 1966 amendment.

"Substantial publicity alone is not enough to require a change of venue." *United States v. Stevens*, 83 F.3d 60, 66 (2d Cir. 1996).  Instead, "[i]n order to prevail on a motion under Rule 21(a), the defendant must show 'a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial.'"  *United States v. Maldonado-Rivera*, 922 F.2d 934, 966-67 (2d Cir. 1990) (quoting *Sheppard*, 384 U.S. at 363); *see also Sabhnani*, 599 F.3d at 232.

> In assessing the motion, the district court may take into account, *inter alia*, the extent to which the government is responsible for generating the publicity, the extent to which the publicity focuses on the crime rather than on the individual defendants charged with it, and other factors reflecting on

the likely effect of the publicity on the ability of potential jurors in the district
to hear the evidence impartially.

*Maldonado-Rivera*, 922 F.2d at 967. "The ultimate determination of whether unfavorable

publicity renders a fair trial unlikely is committed to the district court's discretion . . . ."

*Id.*

## IV.    Application

As an initial matter, the Court notes that the Buffalo Division and the Rochester

Division are not statutory divisions.    *Compare* 28 U.S.C. § 112(d) (not establishing

divisions within the Western District of New York) *with, e.g.*, 28 U.S.C. § 84(c)

(establishing three divisions in the Central District of California), *and* 28 U.S.C. § 124

(establishing seven divisions in each of the Northern, Southern, Eastern, and Western

Districts of Texas); *see also People v. Operation Rescue Nat'l*, 69 F. Supp. 2d 408, 416 n.4

(W.D.N.Y. 1999) (noting that "the court in Rochester is not a separate statutory 'division'

of [the Western District of New York]"). Rather, the so-called divisions of this District

were created by local rule simply as a matter of administrative convenience.[9] Because this

District is not separated into divisions, "trial at any place within the district is allowable

under the Sixth Amendment and the first sentence of" Rule 18.    *Fernandez*, 480 F.2d at

731; *see also United States v. Plaza-Andrades*, 507 F. App'x 22, 26 (2d Cir. 2013) ("[O]ur

precedent makes clear that the Sixth Amendment does not entitle a defendant to be tried in

---

[9]      The District is also "divided into two divisions for jury selection purposes only."
United States District Court, Western District of New York, *Jury Plan* (Oct. 2016), located
at      www.nywd.uscourts.gov/sites/nywd/files/DistrictPlans_2016%20Jury%20Plan%20-
%20FINAL-WebVersion.pdf.

a geographic location any more specific than the District where the offense was allegedly committed."). Pursuant to Rule 18, the Government has properly prosecuted this case in the Western District of New York, and the Court has properly set the place of trial in Buffalo, where the Indictment was returned; defendants, most defense counsel, and the prosecutors are located; the offenses were allegedly committed; and many witnesses are located.[10] Pirk and Jenkins have not disputed these points or offered any claim that a trial in Buffalo would unduly inconvenience them or any witness or victim.

Rather, Pirk's and Jenkins' arguments focus on the prejudicial nature of pretrial publicity. However, neither the Sixth Amendment nor Rule 21(a) requires a transfer out of the district (as Jenkins requested) or a transfer within the district to Rochester (as Pirk requested and Jenkins requested as an alternative). Without a doubt, in the Buffalo area, pretrial press coverage of this case has been significant during various periods of time

---

[10]    The undersigned's "duty station" is not in Buffalo, but rather in Rochester. As a result, trying the case in Rochester arguably would promote the administration of justice given the challenges that a trial of this length will present to the undersigned's management of the other cases on her docket. Although selecting the place of trial *solely* based on the convenience of the judge may be an abuse of discretion, it is one factor to consider. *See Fernandez*, 480 F.2d at 730 (questioning the propriety of setting place of trial based solely on the convenience of the judge and stating that reversal on that ground alone may have been warranted if the defendant had shown prejudice); *see also United States v. Garza*, 593 F.3d 385, 390 (5th Cir. 2010) ("This factor [of the prompt administration of justice] includes more than the case at bar; the phrase includes the state of the court's docket generally." (internal quotation marks and citations omitted)); *United States v. Rosier*, 623 F. Supp. 98, 99 n.1 (W.D. Mo. 1985) ("The undesirable aspect of removing a judge from h[er] home station, and from the processing of h[er] docket, is itself apparently a proper consideration . . . ."). Nevertheless, the Court is sensitive to the fact that, with the exception of counsel for Jenkins and Pirk, all other counsel expressed a strong preference for trying the case in Buffalo. Indeed, no other defendant besides Pirk or Jenkins has expressed a concern about the pretrial publicity.

following the September 6, 2014, murders. (*See* Dkt. 434-5). However, Pirk and Jenkins have not shown a reasonable likelihood that the press coverage thus far would prevent them from receiving a fair trial in Buffalo.

First, the size and characteristics of the community weigh against a finding of prejudice. The Government represents that the Buffalo division of this district has a population of 1.5 million people, spread out over 6,439 square miles. (Dkt. 491 at 34). This is significantly greater than the community in *Rideau*, where the population was 150,000. *See Rideau*, 373 U.S. at 724. A jury drawn from a population the size of the one in the Buffalo division reduces the likelihood of prejudice.

Second, the Court finds that, although news coverage has occurred, Pirk and Jenkins have not demonstrated that the press coverage is more than just adverse pretrial publicity. As discussed above, jurors must be impartial, but they need not be ignorant. Although Pirk has suggested that the Government is responsible for generating the publicity, particularly with the August 2016 press release, he has not shown that the press release has so saturated the public's awareness so as to prevent the Court from impaneling an impartial jury over a year after the press release was issued. Likewise, the bulk of the cited newspaper articles were published in 2014, 2015, and 2016—well before this trial is set to begin on January 16, 2018. (Dkt. 434-5 at 95). The exception is the more recent news coverage of the indictment against four additional KMC members; that indictment was filed October 4, 2017. (*See* W.D.N.Y. 1:17-CR-00189 EAW (Dkt. 1)). Although the *Buffalo News* article about that new indictment is more recent than those cited in Pirk's initial motion for a change of venue, it still precedes the trial by three months, having been published on

October 23, 2017. *Some* publicity does not warrant a transfer. The objected-to press coverage is not enough to convince the Court that the pretrial publicity has been so substantial and inflammatory that Pirk and Jenkins cannot receive a fair trial in the Buffalo division of this district. Indeed, the cited press coverage has been limited primarily to one media outlet—the *Buffalo News*—and defendants have not identified the permeation of coverage, particularly recently, in other media venues.

Finally, any alleged bias among the community in the Buffalo area is likely to be remedied by this Court's careful voir dire questioning of the prospective jurors. Indeed, "[c]areful voir dire questioning is a recognized and effective tool to uncover bias" and "thorough voir dire examinations have been used in [the Second Circuit] to produce unbiased juries, even in high-profile cases." *Volpe*, 42 F. Supp. 2d at 218 (citations omitted). Accordingly, Pirk's and Jenkins's motions to change venue are denied, and the trial commencing on January 16, 2018, will take place in Buffalo, New York.

## CONCLUSION

For the reasons set forth above, the Court grants the motions to sever by Caruso (Dkt. 776), Wood (Dkt. 777), and Stacharczyck (Dkt. 785), and severs Caruso, Wood, Stacharczyck, and Williams from the trial commencing on January 16, 2018, in Buffalo, New York.

The Court denies Pirk's Motion to Change Venue and Location of Jury Trial (Dkt. 434), Pirk's Motion to Sever (Dkt. 435), Jenkins' Motion to Change Venue (Dkt. 522), Olejniczak's Motion to Sever Defendant (Dkt. 781), Willson's Motion to Sever Defendant (Dkt. 782), McIndoo's Motion for Joinder (Dkt. 783), Olejniczak's Amended Motion to

Sever Defendant (Dkt. 784), Osborne's Motion to Sever Defendant and Motion for Joinder (Dkt. 787), Pirk's Renewed Motion to Sever (Dkt. 789), Enix's Motion to Sever Defendant (Dkt. 790), Scanlon's Motion to Sever Defendant (Dkt. 791), Jenkins' Motion to Sever (Dkt. 792), Pirk's Motion to Change Location of Trial and Sever Trial (Dkt. 833), and Jenkins' Motion for Joinder (Dkt. 836).

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: January 15, 2018
       Buffalo, New York