UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



UNITED STATES DISTRICT COURT
FILED
DEC 1 9 2018
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

UNITED STATES OF AMERICA,

v.

DAVID PIRK, ANDRE JENKINS a/k/a
Little Bear, and TIMOTHY ENIX a/k/a Blaze,

Defendants.

**DECISION AND ORDER**

1:15-CR-00142 EAW

## I.   <u>INTRODUCTION</u>

Defendants David Pirk ("Pirk"), Andre Jenkins ("Jenkins"), and Timothy Enix ("Enix") (collectively "Defendants") were convicted after a four-month jury trial on May 18, 2018, of various crimes as charged in the Second Superseding Indictment pertaining to the operation of the Kingsmen Motorcycle Club ("KMC"). Sentencing is scheduled for February 28, 2019.

This Decision and Order resolves Defendants' post-verdict motions filed pursuant to Federal Rules of Criminal Procedure 29(c) and 33 (Dkt. 1322; Dkt. 1325; Dkt. 1326), except for Defendants' challenges based upon *Sessions v. Dimaya*, ___ U.S. ___, 138 S.Ct. 1204 (2018).[1]  Upon due consideration of the parties' submissions and the evidence set forth during trial, and for the reasons set forth below, the Court denies Defendants' post-

---

[1]      Defendants seek to set aside their convictions on Count 2 for violations of 18 U.S.C. § 924(c)(1)(A)(i) and 2, based upon the Supreme Court's decision in *Dimaya*. (Dkt. 1322-1 at 6; Dkt. 1325-1 at 16).  The Court accepted additional briefing and conducted further oral argument with respect to the *Dimaya* issues, and it intends to issue a separate Decision and Order addressing that aspect of the post-verdict motions.

verdict motions, except the Court continues to reserve decision on the post-verdict motions seeking to set aside each Defendant's conviction on Count 2 based upon *Dimaya*.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

Defendants were charged, along with 13 other defendants,[2] by a 46-count Second Superseding Indictment returned on March 16, 2016.   (Dkt. 33 (hereinafter "the Indictment" or "SSI")).   The Indictment portrayed a violent motorcycle club engaged in drug trafficking and firearms offenses, obsessed with maintaining its perceived power and preventing members from "jumping patch" to rival biker clubs through the use of threats, intimidation, and violence, ultimately escalating to the execution-style murders of two allegedly disloyal members (Paul Maue ("Maue") and Daniel "DJ" Szymanski ("Szymanski")) on September 6, 2014, at the KMC North Tonawanda Chapter clubhouse. (*Id.* at ¶ 59).   The KMC operated clubhouses in New York, Tennessee, Pennsylvania, and Florida.   The evidence produced at trial[3] demonstrated that the organization functioned through a strict hierarchal structure governed by written bylaws with dues paid through each KMC chapter to the national organization in Florida.   Pirk served at the top of the organization as National President, and Enix operated as his righthand man as the

---

[2]      All other defendants entered into pleas prior to trial, including the additional four defendants who were charged by separate indictment in Case No. 1:17-CR-00189-EAW. As a result, a total of 20 defendants have been convicted for their crimes related to the KMC.

[3]      The entire trial transcript has not yet been prepared, and therefore the Court is primarily relying on its notes in connection with its recitation of the evidence in this Decision and Order.   Of course, if the certified transcripts differ from the Court's recitation of the evidence, the transcripts control.

Florida/Tennessee Regional President. Jenkins served as a Nomad, an enforcer who acted on behalf of the National President and who killed Maue and Szymanski.

The Indictment charged Pirk in eight separate counts,[4] as follows:

(1)    Count 1—RICO[5] Conspiracy in violation of 18 U.S.C. § 1962(d);

(2)    Count 2—Possession of Firearms in Furtherance of Crime of Violence (the RICO Conspiracy charged in Count 1), in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2;

(3)    Count 3 (Count 19 in SSI)—Murder in Aid of Racketeering in violation of VICAR,[6] 18 U.S.C. §§ 1959(a)(1) and 2;

(4)    Count 4 (Count 20 in SSI)—Murder in Aid of Racketeering in violation of VICAR, 18 U.S.C. §§1959(a)(1) and 2;

(5)    Count 5 (Count 21 in SSI)—Possession and Discharge of Firearm in Furtherance of Crime of Violence (the VICAR murder charged in Count 3), in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii), 924(j), and 2;

(6)    Count 6 (Count 22 in SSI)—Possession and Discharge of Firearm in Furtherance of Crime of Violence (the VICAR murder charged in Count 4), in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii), 924(j), and 2;

(7)    Count 8 (Count 45 in SSI)—Using and Maintaining the KMC South Buffalo Chapter's Clubhouse for Drug Dealing, in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2; and

---

[4]    Although there were 46 separate counts set forth in the SSI (Dkt. 33), Defendants were charged in only nine of those counts. Therefore, the counts were renumbered for purposes of trial. (Dkt. 1256; Dkt. 1257). For purposes of this Decision and Order, the Court will use the renumbered counts as used at trial, but during its initial recitation of each count, the Court will, where applicable, also refer to the SSI's numbering.

[5]    "RICO" refers to the Racketeer Influenced and Corrupt Organizations Act, codified at 18 U.S.C. §§ 1961-1968.

[6]    "VICAR" refers to the Violent Crimes in Aid of Racketeering statute, codified at 18 U.S.C. § 1959.

(8)     Count 9 (Count 46 in SSI)—Possession of Firearms in Furtherance of Drug Trafficking Crime (the Drug Premises violation charged in Count 8), in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2.

Jenkins was charged in the same eight counts as Pirk, and he was also charged in a ninth count—Count 7 (Count 23 of the SSI)—with being a Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  In addition, the Indictment alleged Special Sentencing Factors for Pirk and Jenkins on Count 1, pertaining to the deaths of Maue and Szymanski.

The Indictment charged Enix with a total of four counts:  Count 1 (the RICO conspiracy in violation of 18 U.S.C. § 1962(d));  Count 2 (possession of firearms in furtherance of RICO conspiracy in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2);  Count 8 (Using and Maintaining the KMC South Buffalo Chapter's clubhouse for drug dealing, in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2); and Count 9 (possession of firearms in furtherance of drug trafficking, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2).

The trial spanned a total of four months.  Jury selection commenced on January 16, 2018, and consumed multiple days of written and oral questioning, in both a group and individual setting, driven in large part by the pretrial publicity that had surrounded the case, including Jenkins' murder conviction in New York State court and the Court's decision to exclude that evidence.  Jury selection concluded on February 7, 2018, when twelve jurors and six alternates were selected.  Opening statements began on February 20, 2018, with the Government commencing its presentation of proof on February 22, 2018.  The Government's case continued for 10 weeks through May 3, 2018, when the Government

- 4 -

rested. The Government called over 60 witnesses, including many high-ranking KMC members who cooperated with the Government and provided inside information as to the operation of the club. The Government entered over 800 exhibits into evidence including videos and other photographic evidence, phone records, Facebook messages, DNA evidence, ballistic evidence, and KMC meeting minutes.

Defendants put on a case that lasted one week. Pirk presented proof on May 7 through 9, including his own testimony, and Enix presented proof on May 9 through 11, including his own testimony. Jenkins elected not to present any proof.

Thus, the proof alone consumed 11 full weeks. Counsel presented closing arguments on May 14 and 15, and the Court charged the jury on May 15 and 16, with the jury commencing its deliberations on May 16, 2018.

On May 18, 2018, the jury returned guilty verdicts with respect to each Defendant on each of the counts charged. (Dkt. 1258; Dkt. 1259).

On June 25, 2018, pursuant to the schedule set by the Court, Defendants filed post-verdict motions pursuant to Federal Rules of Criminal Procedure 29(c) and 33. (Dkt. 1322 (Enix); Dkt. 1325 (Pirk); Dkt. 1326 (Jenkins)). On August 1 and 3, 2018, the Government filed responses in opposition of each of Defendants' motions. (Dkt. 1367 (Enix Opp.); Dkt. 1370 (Pirk Opp.); Dkt. 1371 (Jenkins Opp.)). On August 10, 2018, Defendants each filed reply papers in further support of their motions. (Dkt. 1379 (Jenkins Reply); Dkt. 1381 (Pirk Reply); Dkt. 1382 (Enix Reply)). On August 17, 2018, the Government filed a consolidated sur-reply to Defendants' reply papers. (Dkt. 1388). Oral argument was held

before the undersigned on August 21, 2018, at which time the Court reserved decision. (Dkt. 1391).[7]

## III.  LEGAL STANDARDS

### A.  Rule 29 Standard

Rule 29(c)(1) of the Federal Rules of Criminal Procedure provides that "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict. . . ." The standard on a motion for a judgment of acquittal is stringent, and a defendant claiming that he was convicted based on insufficient evidence "bears a very heavy burden." *United States v. Blackwood*, 366 F. App'x 207, 209 (2d Cir. 2010) (quoting *United States v. Desena*, 287 F.3d 170, 177 (2d Cir. 2002)). "In considering a motion for judgment of acquittal, the court must view the evidence presented in the light most favorable to the government." *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999). Accordingly, "[a]ll permissible inferences must be drawn in the government's favor." *Id.*

"If *any* rational trier of fact could have found the essential elements of the crime, the conviction must stand." *United States v. Puzzo*, 928 F.2d 1356, 1361 (2d Cir. 1991)

---

[7]  As noted previously, the Court accepted further briefing and argument concerning the *Dimaya* issues. Specifically, a status conference was held before the undersigned on September 25, 2018 (Dkt. 1408), and the Court agreed to accept further briefing and hear additional oral argument due to subsequent caselaw developments related to the *Dimaya* issues. The Government and Enix filed simultaneous supplemental briefs on November 7, 2018 (Dkt. 1462 (Enix); Dkt. 1463 (Gov't)), and oral argument was held before the undersigned on November 14, 2018 (Dkt. 1465), at which time the Court reserved decision. As noted above, the Court will separately address Defendants' post-verdict motions seeking to set aside their convictions on Count 2 based on *Dimaya*.

(quotation and citation omitted). "The test is whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt." *Id.* (quotation and citation omitted). The evidence must be viewed "in its totality, not in isolation," *United States v. Huezo*, 546 F.3d 174, 178 (2d Cir. 2008) (quotation and citation omitted), "as each fact may gain color from others," *Guadagna*, 183 F.3d at 130. The Court may enter a judgment of acquittal only if the evidence that the defendant committed the crime is "nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Id.* (quotation and citation omitted).

A district court must be careful not to usurp the role of the jury. "Rule 29(c) does not provide the trial court with an opportunity to 'substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury.'" *Id.* at 129 (alteration in original) (quoting *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984)). "[A] jury's verdict will be sustained if there is substantial evidence, taking the view most favorable to the government, to support it." *United States v. Nersesian*, 824 F.2d 1294, 1324 (2d Cir. 1987). The government is not required "to preclude every reasonable hypothesis which is consistent with innocence." *United States v. Chang An-Lo*, 851 F.2d 547, 554 (2d Cir. 1988) (citing *United States v. Fiore*, 821 F.2d 127, 128 (2d Cir. 1987)). Further, "the jury's verdict may be based entirely on circumstantial evidence." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995).

## B.    Rule 33 Standard

Rule 33 of the Federal Rules of Criminal Procedure allows a court to vacate a judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a).  In evaluating the sufficiency of the evidence for purposes of Rule 33, the Court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *Id.* "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33. . . ." *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009).

"Because motions for a new trial are disfavored in this Circuit the standard for granting such a motion is strict; that is, newly discovered evidence must be of a sort that could, if believed, change the verdict." *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995).  Indeed, to justify the granting of a Rule 33 motion, "a district court must find that there is a real concern that an innocent person may have been convicted." *McCourty*, 562 F.3d at 475 (quotation and citation omitted).  For these reasons, a court will grant a new trial only "in the most extraordinary circumstances." *United States v. Locascio*, 6 F.3d 924, 949 (2d Cir. 1993).

## IV.    ENIX'S SUFFICIENCY-BASED CHALLENGES TO COUNT 2

In addition to challenging his conviction on Count 2 based on *Dimaya*, Enix argues that the conviction must be set aside pursuant to Rule 29(c) because "the evidence is insufficient to sustain his conviction as to that Count because he never agreed that a member of the racketeering conspiracy would attempt, solicit, or conspire to engage in

- 8 -

murder in violation of Florida law." (Dkt. 1322-1 at 22). He additionally argues that the proof was insufficient to convict him under an aiding or abetting or *Pinkerton* theory of liability. (*Id.* at 24).

The Court instructed the jury that in order to convict Enix of the § 924(c) charge in Count 2, it would need to unanimously conclude that the Government proved each of the following elements beyond a reasonable doubt: (1) Enix committed a crime of violence for which he might be prosecuted in a court of the United States; and (2) he knowingly possessed a firearm in furtherance of the crime of violence. The Court also instructed the jury that Enix was charged as both a principal and an aider and abettor with respect to Count 2, and that if the crime charged in Count 2 was committed by another person, but Enix took an affirmative act in furtherance of the underlying crime with the intent to facilitate the offense's commission,[8] then he could be found guilty of the crime as an aider and abettor.

The Court also gave an instruction pursuant to *Pinkerton v. United States*, 328 U.S. 640 (1946), that if the jury concluded Enix was a member of the RICO conspiracy charged in Count 1, then they may find him guilty of the § 924(c) charge in Count 2, if they concluded that the Government proved beyond a reasonable doubt: (1) that the crime

---

[8]     Consistent with *Rosemond v. United States*, 572 U.S. 65 (2014), the Court instructed the jury that the Government must prove that Enix had advance knowledge that an accomplice would be possessing, using, or carrying a firearm during the commission of the crime of violence because it was not enough to have intent with respect to the RICO conspiracy; rather, Enix must have the requisite intent concerning the entirety of the crime, including the firearm possession.

charged in Count 2 was committed; (2) that the person(s) committing the crime charged in Count 2 was a member of the conspiracy; (3) that the crime charged in Count 2 was committed pursuant to a common plan and understanding existing among the conspirators; (4) that Enix was a member of the conspiracy at the time the crime in Count 2 was committed; and (5) that Enix could have reasonably foreseen that the substantive crime charged in Count 2 might be committed by his co-conspirators.

Defendant's sufficiency argument focuses on the special interrogatories answered by the jury as part of the verdict form to address the uncertainty concerning the implications of the *Dimaya* decision. By way of background, when the Court charged the jury on May 15 and 16, 2018, the Supreme Court one month earlier had declared that 18 U.S.C. § 16(b) as incorporated into the Immigration and Nationality Act's definition of "aggravated felony" at 8 U.S.C. § 1101(a)(43)(F) was impermissibly vague in violation of due process. *Dimaya*, 138 S.Ct. at 1215. As acknowledged by Justice Roberts in his dissenting opinion, "§ 16 serves as the universal definition of 'crime of violence' for all of Title 18," including the definition applicable to § 924(c), and therefore, the Court's holding in *Dimaya* "calls into question convictions" under § 924(c). 138 S.Ct. at 1241. Weeks after *Dimaya* was issued, the Second Circuit issued an amended decision in *United States v. Hill*, 890 F.3d 51 (2d Cir. 2018), removing its discussion about whether Hobbs Act robbery constituted a crime of violence under § 924(c)(3)(B) and expressing no view as to whether that clause was void for vagueness, *id*. at 53 n.2, and the Tenth Circuit Court of Appeals (the only circuit court at the time the jury was charged in this case to have addressed the issue post-

*Dimaya*) concluded that *Dimaya*'s reasoning extended to § 924(c)(3)(B) and rendered it unconstitutionally vague, *United States v. Salas*, 889 F.3d 681, 686 (10th Cir. 2018).[9]

Due to these developments and in an effort to provide the parties, this Court, and any appellate court insight into the jury's reasoning with respect to its findings on Count 2, the Court instructed the jury to make specific findings as part of its consideration of Count 2, as to the racketeering activity (if any) that each Defendant agreed would be committed by a member of the conspiracy. Not all charged predicate acts were part of the questions posed to the jury; only those that could potentially qualify as crimes of violence if charged as substantive offenses—namely murder (under New York and Florida law), robbery (under New York and Florida law, and the Hobbs Act), and kidnapping (under Florida law).

The jury returned a guilty verdict on Count 2 with respect to Enix, and when answering the special interrogatories, it identified Enix as having agreed with at least one other co-conspirator that murder, in violation of Florida Statutes Annotated §§ 782.04(1)(a)(1), 782.04(1)(a)(2)(d)-(f), and 777.04(1)-(3), would be committed by a member of the conspiracy in the conduct of the affairs of the enterprise. The jury answered "no" with respect to Enix concerning the other identified predicate acts that potentially constituted crimes of violence (i.e., murder under New York law, robbery under New York and Florida law and the Hobbs Act, and kidnapping under Florida law).

---

[9]     More recently, on September 10, 2018, the Second Circuit decided *United States v. Barrett*, 903 F.3d 166 (2d Cir. 2018), holding that § 924(c)(3)(B) is not unconstitutionally vague. The implications of *Barrett* and the *Dimaya*-related issues raised by Defendants will be addressed in a separate Decision and Order.

Enix now argues that the evidence was not sufficient to sustain a conclusion that he agreed that a member of the RICO conspiracy would commit murder under Florida law.[10] (Dkt. 1322-1 at 22-24). The Court disagrees.

Drawing all inferences in favor of the Government, the Court concludes that the evidence was sufficient to convict Enix on Count 2. Evidence was admitted that in or about January 2014, Filip Caruso ("Caruso") and David Masse travelled to Florida and met with Enix, Pirk, and other KMC members to plan an effort to retrieve KMC property from the Pagans (a rival motorcycle club) "by any means necessary." Although that initial effort did not come to fruition, a subsequent meeting with the Pagans occurred in 2014. Testimony was introduced from multiple witnesses that Enix was armed during that subsequent meeting with the Pagans, the purpose of which was to retrieve KMC property. The jury, drawing reasonable inferences from the evidence, could fairly and logically conclude that Enix was guilty beyond a reasonable doubt of planning to kill the Pagans if

---

[10]    In its separate Decision and Order on the *Dimaya* issues, the Court will address whether, even if Enix did not specifically agree to the commission of a predicate crime of violence, he may nonetheless be convicted of Count 2. In other words, "the agreement proscribed by section 1962(d) is [a] conspiracy to participate in a charged enterprise's affairs, not [a] conspiracy to commit predicate acts." *United States v. Yannotti*, 541 F.3d 112, 121 (2d Cir. 2008) (alterations in original). Thus, if the charged RICO conspiracy qualifies as a crime of violence, then any member of the conspiracy may arguably be found guilty of violating § 924(c) by possessing firearms in furtherance of that conspiracy, even if the defendant did not specifically agree to the commission of violent predicate acts. As a result, even if the evidence was not sufficient to support the jury's finding as to Enix's agreement concerning the violation of the Florida murder statutes, that does not mean that his conviction on Count 2 must be set aside. However, since the Court concludes that the evidence was sufficient to find that Enix agreed that a member of the conspiracy would violate the Florida murder statutes, it does not need to address this alternative point for purposes of this Decision and Order.

- 12 -

he and the other KMC members were unable to voluntarily retrieve the KMC property. Although Enix contends that he was armed only for purposes of "self-defense" (Dkt. 1382 at 28), that not only misses the point of the § 924(c) offense charged in Count 2, but Enix's version of events was not credited by the jury. The evidence produced at trial supported a conclusion that Enix, Pirk, Jenkins, and other KMC members planned and plotted their meeting with the Pagans in 2014, and then travelled to that meeting prepared to engage in warfare with the Pagans if they were unable to retrieve their property. While violence did not become necessary, and Pirk and Enix were able to negotiate the return of the KMC property, the evidence supported the jury's conclusion that the KMC members (including Enix) were prepared to use their firearms if necessary. Drawing all inferences in favor of the Government, the jury could have reasonably concluded that Enix solicited people and helped come up with a plan, and took steps toward achieving the plan, to ultimately murder members of the Pagans if the KMC members were unable to retrieve their property. The evidence suggested that Enix helped recruit the right people who were willing to use their firearms if necessary in the meeting with the Pagans, and he went to that meeting with those individuals, armed with firearms and a plan of attack. Thus, based on the proof at trial, the jury could have reasonably concluded that Enix possessed a firearm in a manner that facilitated the RICO conspiracy in Count 1. As a result, Enix's Rule 29(c) motion on this ground must be denied.

## V.  DEFENDANTS' SUFFICIENCY-BASED CHALLENGES TO COUNTS 8 AND 9

Enix argues that the proof was insufficient at trial to sustain his convictions on Counts 8 and 9. (Dkt. 1322-1 at 25-36). Pirk joins in Enix's motion to vacate his conviction on Count 8 (Dkt. 1325-1 at 18-19), and moves to vacate his conviction on Count 9 (*id.* at 14-16). Jenkins also moves to vacate his convictions on Counts 8 and 9. (Dkt. 1326 at 5).

### A.  The Rule 29(c) Motions Directed to Count 8

The evidence was sufficient to convict Defendants on Count 8, which charged them with using or maintaining the South Buffalo Chapter clubhouse as a premises for drug manufacturing, distribution, or use, in violation of 21 U.S.C. § 856(a)(1) and 18 U.S.C. § 2. The Court instructed the jury that in order to convict a Defendant for a violation of Count 8, they needed to find that the Government proved beyond a reasonable doubt that the Defendant under consideration permanently or temporarily used or maintained the South Buffalo Chapter clubhouse for the purpose of manufacturing, distributing, or using cocaine or marijuana, and he acted knowingly. The Court finds that the jury, drawing reasonable inferences from the evidence, could fairly and logically conclude that the Government met its burden of proof with respect to each Defendant.

One of Enix's arguments is that there was no evidence that the purpose of the clubhouse was for drug use or distribution. (Dkt. 1322-1 at 27). The Court instructed the jury that while the Government was not required to prove that drug activity was the only purpose of using or maintaining the clubhouse, it needed to prove that drug activity was a

significant or important reason for maintaining the clubhouse. Viewing the evidence in the light most favorable to the Government, the Court concludes that the evidence supported the conclusion that an important reason for maintaining the South Buffalo clubhouse was to use and distribute illegal drugs. Numerous witnesses testified about pervasive drug use and distribution that occurred within the South Buffalo Chapter clubhouse and at all KMC clubhouses. Witnesses also testified that the South Buffalo Chapter clubhouse (like all clubhouses) was stocked with firearms, which are "tools of the trade" of drug dealers and therefore evidence of drug dealing. *See United States v. Vegas*, 27 F.3d 773, 778 (2d Cir. 1994) ("[T]his Court has repeatedly approved the admission of firearms as evidence of narcotics conspiracies, because drug dealers commonly keep firearms on their premises as tools of the trade." (quotation and citation omitted)). In fact, a photograph was introduced into evidence depicting Enix in the South Buffalo Chapter clubhouse posing with a firearm. Evidence was introduced that the South Buffalo Chapter clubhouse was maintained like a fortress, and there was also testimony that Pirk and Enix ordered the clubhouses cleared of any contraband before law enforcement raided them, evidencing knowledge of illegal activity occurring within the clubhouses. Additionally, evidence was introduced that Enix paid the bills allowing for the continuing operation of the South Buffalo Chapter clubhouse, and evidence was introduced at trial about drug use by all Defendants, including Enix.

Based on that testimony and evidence, the jury could reasonably conclude that the South Buffalo Chapter clubhouse was used or maintained for drug activity—indeed, it was pervasive and a significant or important reason for the clubhouse's operations. There was also evidence sufficient for the jury to find each Defendant used or maintained the

clubhouse as a drug premises, including Enix by virtue of his direct activities in keeping the clubhouse open and the circumstantial evidence of his knowledge as to the drug activities in the South Buffalo Chapter clubhouse. At a minimum, the jury, drawing reasonable inferences from the evidence, could fairly and logically conclude that each Defendant was guilty beyond a reasonable doubt as an aider and abettor on Count 8. In addition, there was also evidence sufficient for the jury to find each Defendant guilty on Count 8 under a *Pinkerton* theory of liability. *See United States v. Masotto*, 73 F.3d 1233, 1239 (2d Cir. 1996) ("Under the *Pinkerton* theory of liability, a conspirator can be held responsible for the substantive crimes committed by his co-conspirators to the extent those offenses were reasonably foreseeable consequences of acts furthering the unlawful agreement, even if he did not himself participate in the substantive crimes."); *see also United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007) ("An offense by a co-conspirator is deemed to be reasonably foreseeable if it is 'a necessary or natural consequence of the unlawful agreement.'" (quoting *Pinkerton v. United States*, 328 U.S. at 648)).

**B.      The Rule 29(c) Motions Directed to Count 9**

Enix argues that there was insufficient evidence to convict him on Count 9, asserting that the evidence failed to show that he possessed firearms with intent to further the drug trafficking offense in Count 8. (Dkt. 1322-1 at 32-36). Pirk reiterates this argument, as does Jenkins. (Dkt. 1325-1 at 14-16; Dkt. 1326 at 5).

Viewing the evidence in the light most favorable to the Government, the Court must reject Defendants' arguments. As recounted above, the photographic and testimonial evidence established that the South Buffalo Chapter clubhouse, like all other KMC

clubhouses, contained several firearms, and that KMC members were engaged in drug use and distribution inside that clubhouse. As to Pirk and Enix, the evidence established that they were part of the KMC leadership and controlled the club through the established chain of command. By way of example, evidence was introduced that Enix acted as Pirk's spokesperson and orchestrated club activities through Facebook communications, including support of the activities at the South Buffalo Chapter clubhouse and support of KMC members who were drug dealers. Evidence was introduced that the possession of firearms permeated the operation of the club—they were a fundamental tool possessed by KMC members while engaging in the activities necessitated by club membership.

In the very least, there was sufficient evidence that Defendants were liable for the § 924(c) offense in Count 9 as aiders and abettors, or under a *Pinkerton* theory of liability. With respect to aiding and abetting, the evidence was sufficient for a reasonable jury to conclude that each Defendant had advance knowledge that an accomplice would be possessing a firearm in furtherance of maintaining or using the South Buffalo Chapter clubhouse for drug use or distribution. Again, there was a photograph of Enix introduced at trial depicting him holding a firearm (along with other KMC members doing the same) in the South Buffalo Chapter clubhouse. Moreover, like the other clubhouses, firearms were stored at the South Buffalo Chapter clubhouse for protection, and the evidence demonstrated that KMC members were regularly armed.

"[A] defendant may be guilty of a § 924(c) violation under a *Pinkerton* theory if: (1) the defendant conspired to commit a crime involving violence or drug trafficking; (2) the § 924(c) offense was committed in furtherance of the conspiracy; and (3) the offense

was a reasonably foreseeable consequence of an act furthering the unlawful agreement." *Rosario v. United States*, 164 F.3d 729, 734 (2d Cir. 1998). The evidence supports the conclusion that one of the objectives of the KMC was to provide drugs at all clubhouses, including the South Buffalo Chapter clubhouse. Indeed, a reasonable jury could conclude that the KMC maximized its profits through this drug dealing by attracting members into the clubhouses. Witnesses testified that the South Buffalo Chapter clubhouse was heavily armed in order to protect its contents, including its drugs. "Recognizing that in the drug culture, firearms are the tools of the trade, any reasonable juror would conclude that the § 924(c) violations were a reasonably foreseeable concomitant to the drug sales." *Id.* at 735 (quotation and citation omitted). Drawing all reasonable inferences in favor of the Government, as the Court must on a Rule 29(c) motion, the evidence sufficiently supported the jury's findings with respect to Count 9.

## VI.    ENIX'S UNANIMITY-BASED CHALLENGE TO COUNT 1

Enix argues that the conviction on Count 1 must be set aside pursuant to Rule 29(c) because the jury found that Enix joined an agreement that is different than the agreements that Pirk and Jenkins joined. (Dkt. 1322-1 at 36-47). Enix bases his argument on the jury's conclusions in the Count 2 special verdict interrogatories that Enix did not agree to any violation of the New York Penal Law or the Hobbs Act, whereas the jury found that Pirk and Jenkins agreed to the New York Penal Law violations and that Pirk additionally agreed to the Hobbs Act violation. (Dkt. 1258 at 3-8). The Court rejects Enix's arguments.

First, a conspirator need not have full knowledge of all aspects of the conspiracy:

> [T]here is no rule requiring the government to prove that a conspirator knew of all criminal acts by insiders in furtherance of the conspiracy.
>
> No theory requires co-conspirators to have such knowledge. *To be convicted as a conspirator, one must be shown to have possessed knowledge of only the general contours of the conspiracy. . . .* While we have held that too little knowledge may undermine a conspiracy conviction, there is no requirement that a defendant must have been omniscient.

*United States v. Zichettello*, 208 F.3d 72, 100 (emphasis added). Second, nowhere on the verdict sheet does it state that the listed racketeering acts are the *only* ones to which a guilty defendant agreed as part of the conspiracy; not every charged racketeering act was listed. (*See* Dkt. 1258). Third, the jury is presumed to have followed the Court's instruction regarding the need for unanimity with respect to the type or types of racketeering activity a defendant agreed would be committed as part of the conspiracy. *See United States v. Snype*, 441 F.3d 119, 129 (2d Cir. 2006) ("[T]he law recognizes a strong presumption that juries follow limiting instructions."). Nothing in the special verdict sheet undermines that presumption; for example, the jury could have unanimously agreed that Defendants agreed to commit a type or types of racketeering acts that were not listed on the special verdict sheet for Count 2. Similarly, the jury did conclude that all three Defendants agreed to the predicate racketeering activity involving murder under Florida law.

A theory of the case pursued at trial by Defendants was that they were not part of the same alleged conspiracy—and that there was a difference between the Florida KMC activities and those "up north" with the KMC in New York. Plainly, the jury's verdict reflected a rejection of this defense theory, and it would not be appropriate for the Court to set aside the jury's findings based upon the evidence presented in this case.

- 19 -

## VII.  PIRK'S ENTERPRISE-BASED CHALLENGE TO COUNT 1

Pirk argues that the Government failed to present sufficient evidence of an enterprise and that, pursuant to Rule 29(c), the Court should vacate his conviction on Count 1 (and related counts, such as Count 2). (Dkt. 1325-1 at 16-17). Pirk raised a similar argument in his pretrial motion to dismiss, and the Court rejected it. *See United States v. Pirk*, 267 F. Supp. 3d 406, 417-22 (W.D.N.Y. 2017). The Court finds no reason to depart from its earlier ruling.

First, proof of enterprise is not necessary to convict a defendant of RICO conspiracy. In *United States v. Applins*, 637 F.3d 59 (2d Cir. 2011), the Second Circuit concluded that the establishment of an enterprise is not a necessary element of RICO conspiracy. With respect to the "enterprise" requirement, the Second Circuit explained: "A RICO enterprise 'is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.' RICO reaches 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Id.* at 73 (quoting *United States v. Turkette*, 452 U.S. 576, 580, 583 (1981)). The Second Circuit further explained: "[T]he existence of an association-in-fact is oftentimes more readily proven by 'what it does, rather than by abstract analysis of its structure.' For this reason, [the Second Circuit has] stated that 'proof of various racketeering acts may be relied on to establish the existence of the charged enterprise.'" *Id.* (quoting *United States v. Coonan*, 938 F.2d 1553, 1559, 1560 (2d Cir. 1991)). Nevertheless, it concluded, based on *Salinas v. United States*, 522 U.S. 52 (1997), that existence of an enterprise is not an element of RICO conspiracy:

> RICO conspiracy requires proof "that a defendant agreed with others (a) to
> conduct the affairs of an enterprise (b) through a pattern of racketeering" and
> that "the conduct prong requires only that conspirators reached a meeting of
> the minds as to the operating of the affairs of the enterprise through a pattern
> of racketeering conduct."

*Id.* at 77 (quoting *United States v. Basciano*, 599 F.3d 184, 199 (2d Cir. 2010)). In other

words, "[u]nder *Applins*, it is clear that the government is not required to prove the

establishment of an enterprise in order to convict Defendants of RICO conspiracy." *United*

*States v. Larson*, No. 07-CR-304S, 2011 WL 6029985, at *5 (W.D.N.Y. Dec. 5, 2011).

Second, even if proof of an enterprise was required, the Government presented

ample evidence of an enterprise in this case. In *Boyle v. United States*, 556 U.S. 938 (2009),

the Supreme Court held that "an association-in-fact enterprise must have at least three

structural features: a purpose, relationships among those associated with the enterprise, and

longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at

946. In so holding, the Supreme Court rejected the petitioner's argument that a RICO

enterprise "must have at least some additional structural attributes, such as a structural

'hierarchy,' 'role differentiation,' a 'unique *modus operandi*,' a 'chain of command,'

'professionalism and sophistication of organization,' 'diversity and complexity of crimes,'

'membership dues, rules and regulations,' 'uncharged or additional crimes aside from

predicate acts,' an 'internal discipline mechanism,' 'regular meetings regarding enterprise

affairs,' an 'enterprise "name,"' and 'induction or initiation ceremonies and rituals.'" *Id.*

at 948.

Here, the evidence more than satisfied the enterprise element. Even the aspects of

an enterprise that did not have to be established—such as chain of command, membership

dues, and rules and regulations—were present here. Thus, while not a required element of the charged RICO conspiracy pursuant to *Applins*, the evidence sufficiently established an enterprise in this case.

## VIII. DEFENDANTS' MULTIPLICY CHALLENGE TO § 924(c) COUNTS

Enix argues that the § 924(c) convictions on Counts 2 and 9 cannot both stand because they involve the same predicate conduct charged in Count 1. (Dkt. 1322-1 at 41-43). Relying on the unpublished summary order issued by the Second Circuit in *United States v. Whyte*, 630 F. App'x 104 (2d Cir. 2015), as well as the decisions in *United States v. Finley*, 245 F.3d 199 (2d Cir. 2001), and *United States v. Wallace*, 447 F.3d 184 (2d Cir. 2006), Enix contends that it is impermissible for two § 924(c) counts to be based on "the same intertwined and overlapping conduct." (Dkt. 1322-1 at 41-43).[11]

---

[11] In a footnote, Enix makes the point that where "a defendant would suffer a 25-year mandatory minimum sentence derived from *Pinkerton* liability arising out of the conduct of others," the circumstances favoring relief are particularly compelling. (Dkt. 1322-1 at 43 n.14). Not only does this argument misconstrue Enix's level of culpability, but the Court views the argument to be one of policy. No party has cited the Court to any caselaw supporting the notion that the multiplicity analysis for § 924(c) convictions is different when a defendant is convicted as an aider and abettor or under a *Pinkerton* theory of liability. The Court must evaluate Enix's multiplicity challenge based upon the law—not based on any policy arguments as to the appropriateness or inappropriateness of a 25-year mandatory minimum consecutive sentence under the circumstances of this case.

Pirk also bases his argument, in part, on the nature of the charges against him in Counts 5 and 6, wherein his alleged conduct was not as one who physically committed the two murders, but rather as one who aided and abetted Jenkins in committing the murders. (Dkt. 1381 at 6). However, again, there is no caselaw cited by any party, and the Court is not aware of any caselaw, suggesting that the multiplicity analysis is different where one is charged as an accessory as opposed to a principal. In other words, the multiplicity analysis is dependent on the underlying unit of prosecution, not the theory of liability for the § 924(c) count.

Pirk joins in Enix's argument with respect to Counts 2 and 9 (Dkt. 1325-1 at 18-19), and he also separately argues that Counts 2, 5 and 6 are multiplicitous, relying on the same caselaw cited by Enix as well as *United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008), (*id.* at 11-14). Jenkins has joined in the post-verdict motions of his co-defendants. (Dkt. 1326 at 8).

The Government, relying on *United States v. Arline*, 835 F.3d 277 (2d Cir. 2016), and also citing to some of the same caselaw as Defendants, contends that different units of prosecution and different conduct serve as the basis for each of the § 924(c) counts and, as a result, Defendants' multiplicity arguments must be rejected. (Dkt. 1367 at 46-48).[12]

The Court finds it challenging to reconcile some of the Second Circuit's caselaw on this issue. The Second Circuit itself has recognized the "wildly divergent interpretations" among the circuits and "that reasoned application of § 924(c)(1) can be extremely difficult." *Finley*, 245 F.3d at 206; *see United States v. Rentz*, 777 F.3d 1105, 1115 (10th Cir. 2015) (en banc) (Gorsuch, J.) ("We don't mean to suggest we think we've somehow cracked § 924(c)'s code. Even now plenty of hard questions remain."). In part, the

---

[12]    The Government also contends that Pirk's multiplicity argument directed to Counts 2, 5, and 6 is barred based upon the Court's prior denial of Pirk's pretrial motion to dismiss. (Dkt. 1370 at 4-5). *See Pirk*, 267 F. Supp. 3d at 427-28. The Court disagrees. "Where there has been no prior conviction or acquittal, the Double Jeopardy Clause does not protect against simultaneous prosecutions for the same offense, so long as no more than one punishment is eventually imposed." *United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006). In other words, the Court does not agree that its prior denial of the pretrial motion to dismiss precludes the same multiplicity argument being raised post-trial. Just because more than one § 924(c) charge could proceed to trial does not mean that each conviction must be sustained.

challenges arise from the interplay among different principles that apply when analyzing separate § 924(c) charges for multiplicity, as well as the "widely-shared view that the statute's text is ambiguous." *Finley*, 245 F.3d at 207. To unravel the multiplicity issues raised by Defendants, the Court starts with a discussion of some basic principles, then moves to a review of each of the counts at issue, the relevant caselaw, and ultimately a conclusion regarding Defendants' multiplicity challenges.

## A.  <u>Relevant Legal Principles</u>

"An indictment is multiplicitous when it charges a single offense as an offense multiple times, in separate counts, when, in law and fact, only one crime has been committed." *United States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999). In other words, "[a]n indictment is multiplicitous if it charges the same crime in two counts." *United States v. Ansaldi*, 372 F.3d 118, 124 (2d Cir. 2004). Punishment for a multiplicitous indictment "violates the Double Jeopardy clause of the Fifth Amendment, subjecting a person to punishment for the same crime more than once." *Chacko*, 169 F.3d at 145.

"It is not determinative whether the same conduct underlies the counts; rather, it is critical whether the 'offense'—in the legal sense, as defined by Congress—complained of in one count is the same as that charged in another." *Id.* at 146. When the same statutory violation is charged multiple times, as is the case with the § 924(c) charges in Counts 2, 5, 6, and 9, "the question is whether the facts underlying each count were intended by Congress to constitute separate 'units' of prosecution." *United States v. Ansaldi*, 372 F.3d 118, 124 (2d Cir. 2004) (quoting *Bell v. United States*, 349 U.S. 81, 83-84 (1955)).

The appropriate unit of prosecution under § 924(c) is the underlying predicate offense rather than the number of firearms. *United States v. Lindsay*, 985 F.2d 666, 674 (2d Cir. 1993). "Only where the defendant commits multiple . . . violent crimes, and the government can link the firearms to those crimes, may the government prosecute for multiple violations of § 924(c)(1)." *Id.* On the other hand, "[w]here the government links multiple firearms to a single crime, only one § 924(c)(1) violation occurs." *Id.*

While double jeopardy principles primarily serve as the basis for a multiplicity challenge to separate § 924(c) counts, principles of statutory interpretation and construction must also be considered. *See United States v. Medina*, 642 F. App'x 59, 61 (2d Cir. 2016) (recognizing that *Lindsay*'s unit of prosecution inquiry was undertaken without any reference to the Double Jeopardy Clause and suggesting that there is a separate, statutory question at play). Moreover, due to the ambiguity of § 924(c)(1), the rule of lenity must guide the statutory interpretation so that any doubt is "resolved against turning a single transaction into multiple offenses." *Finley*, 245 F.3d at 207 (quoting *Bell*, 349 U.S. at 672-73).

With those basic legal principles in mind, the Court now turns to a discussion of each of the counts at issue.

**B.    The § 924(c) Counts**

Both Counts 2 and 9 charged violations of 18 U.S.C. §§ 924(c)(1)(A)(i) and 2, and both covered the same time frame—on or before 2006 through the date of the return of the Indictment. (Dkt. 1255 at 14, 19-20). However, the underlying predicate offenses serving as the basis for Counts 2 and 9 differ. Count 2 charged a firearm offense in furtherance of

- 25 -

an alleged crime of violence—the racketeering conspiracy charged in Count 1—and the jury was specifically instructed that in order to convict on Count 2, they needed to conclude that one or more of the objects of the conspiracy was committing a crime of violence.[13] In contrast, Count 9 charged a firearm offense in furtherance of the substantive drug trafficking crime charged in Count 8 relating to using or maintaining the South Buffalo Chapter clubhouse for the purpose of distributing or using cocaine or marijuana.

Count 1 alleged racketeering activity that included using or maintaining the South Buffalo Chapter clubhouse for drug trafficking purposes, but it also alleged other drug trafficking crimes as part of the racketeering activity, including violations of 21 U.S.C. § 856(a)(1) with respect to other clubhouses, possession with intent to distribute and distribution of controlled substances in violation of 21 U.S.C. § 841(a)(1), and conspiracy to do the same in violation of 21 U.S.C. § 846. Count 1 also alleged non-drug-related racketeering activity including murder and robbery in violation of New York and Florida law, Hobbs Act robbery, kidnapping in violation of Florida law, obstruction of justice, witness tampering, and trafficking of contraband cigarettes. Moreover, while a conviction on Count 8—and therefore Count 9—including as an aider and abettor or under a *Pinkerton* theory of liability—required proof that the offense of using or maintaining the South

---

[13]    Although not part of the elements charged for the RICO conspiracy, this was included as part of the Court's instructions on Count 2 to address the *Dimaya* issues. Specifically, the jury was charged that in their consideration of Count 2, if they concluded that a Defendant was guilty of Count 1 as charged, they must also determine whether the Government had proven that one or more of the objects of the racketeering conspiracy charged in Count 1 was committing a crime of violence. As discussed previously, the jury was asked to make specific findings as to certain racketeering activity that each Defendant agreed would be committed as part of the racketeering conspiracy.

Buffalo Chapter clubhouse for drug trafficking purposes was actually committed, a conviction on Count 1 did not require proof that any of the racketeering acts were actually accomplished.

Both Counts 5 and 6 charged violations of 18 U.S.C. §§ 924(c)(1)(A)(iii), 924(j), and 2. Counts 5 and 6 related to the VICAR murders in aid of racketeering charged in Counts 3 and 4, respectively, with Counts 3 and 5 charged for Maue's murder and Counts 4 and 6 charged for Szymanski's murder. The VICAR statutory violations charged in Counts 3 and 4 (i.e., 18 U.S.C. § 1959(a)(1)) were not separately alleged as racketeering activity in Count 1, although murder in violation of New York law was alleged as part of Count 1's racketeering activity.

## C.     Second Circuit Case Law

In *Lindsay*, the defendant was convicted of a § 924(c) count related to a narcotics conspiracy, which conspiracy charge was a lesser-included offense of the Continuing Criminal Enterprise violation that also served as a separate predicate for another § 924(c) count. 985 F.2d at 669. While not vacating the § 924(c) conviction based on the lesser-included offense, the Second Circuit remanded for resentencing so that the two § 924(c) convictions could be combined. *Id.* at 671. Among other principles, *Lindsay* teaches that separate § 924(c) counts cannot stand based on two underlying predicate offenses where one of the predicates is a lesser-included offense of the other. *See id.* at 674. In other words, *Lindsay* focused on the underlying predicate offense as the appropriate unit of prosecution, concluding that when that predicate offense is the same in law and fact

(including as a lesser-included offense of the other), the § 924(c) convictions cannot be separated.

Employing those principles, the Second Circuit in *Whyte*, 630 F. App'x 104, a case relied upon extensively by Enix (Dkt. 1322-1 at 42), concluded that separate § 924(c) convictions could not stand where one was based on racketeering and racketeering conspiracy counts, and the other was based on a narcotics conspiracy that served as part of the alleged racketeering activity. The Second Circuit concluded that the two § 924(c) counts were multiplicitous because "the predicates for [the defendant's] firearms convictions are a lesser-included offense (the marijuana distribution conspiracy) and greater offenses (the RICO offense and the RICO conspiracy)." *Id.* at 109.

The *Whyte* court did not cite any authority for or provide any analysis or explanation regarding its conclusion that that the marijuana distribution conspiracy was a lesser-included offense of the RICO conspiracy count, and that conclusion conflicts with the Second Circuit's prior caselaw holding otherwise. *See United States v. Thomas*, 757 F.2d 1359, 1370-71 (2d Cir. 1985) (finding that § 846 narcotics conspiracy was not lesser-included offense of § 1962(d) conspiracy even though it was also alleged as part of racketeering activity); *see also Basciano*, 599 F.3d at 199 ("To be sure, the violence proscribed by § 1959 may sometimes be part of a pattern of racketeering proscribed by § 1962. Nevertheless, because distinct factual elements must be proved to establish § 1959(a)(5) and § 1962(d) conspiracies, a defendant may be prosecuted under both statutes without violating the Double Jeopardy Clause."). Moreover, *Whyte*, an unpublished summary order, has never been cited by the Second Circuit or any other court.

Less than a year after the *Whyte* decision was issued, the Second Circuit in *Arline*, 835 F.3d 277, concluded that separate § 924(c) convictions should be allowed to stand where one was predicated on a narcotics conspiracy dating from 2004 through 2011, and the second § 924(c) count was predicated on a racketeering enterprise and conspiracy, but "on occasions other than those described" in the first § 924(c) count. *Id.* at 279, 283. The defendant challenged his conviction on both § 924(c) counts, arguing that they punished simultaneous conduct because the predicates had a temporal overlap of about 5 years and because the racketeering conspiracy alleged a pattern of racketeering activity that included "dealing in a controlled substance." *Id.* at 282. The Second Circuit rejected the defendant's arguments, reasoning that the evidence that the defendant possessed multiple firearms on separate occasions gave the jury ample basis to convict on two separate § 924(c) counts. *Id.* at 283. The court explained as follows:

> [A]lthough [the] incidents [of the defendant's gun possession] may have occurred within the same five-year period—or even in the same month or year—the evidence at trial, and the Government's presentation of that evidence and argument to the jury, demonstrated that the guns were neither linked "to a single crime," nor based on the "continuous possession of a firearm in furtherance of simultaneous predicate offenses consisting of virtually the same conduct."

*Id.* at 282 (quoting *Lindsay*, 985 F.2d at 674, then *Wallace*, 447 F.3d at 188).

Notwithstanding the above caselaw, the Second Circuit has struck down separate § 924(c) convictions even where the underlying predicate offenses are not the same. In *Finley*, 245 F.3d 199, the court concluded that § 924(c) does not support multiple firearm convictions where a defendant possesses a single firearm during a single drug transaction that results in separate drug possession and distribution offenses: "The statute does not

clearly manifest an intention to punish a defendant twice for continuous possession of a firearm in furtherance of simultaneous predicate offenses consisting of virtually the same conduct." *Id.* at 207. In other words, the separate predicate offenses did not charge the same offense, but nonetheless under the rule of lenity and statutory construction principles, the court concluded that the separate § 924(c) convictions could not stand.

Similarly, in *Wallace*, 447 F.3d 184, one § 924(c) count charged that the defendants used a firearm in furtherance of the conspiracy to distribute cocaine base charged in Count One "and, in doing so, murdered Torres in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii), 924(j)(1), and 2"; the other § 924(c) count charged that the defendant used a firearm during a crime of violence (the drive-by shooting charged in Count Twelve in violation of 18 U.S.C. § 36(b)(2)(A) (prohibiting the firing of a weapon in furtherance of a major drug offense)) "and in doing so, murdered Torres, again in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii), 924(j)(1), and 2." *Id.* at 186. The Court addressed the following question: "whether the two § 924(c)(1) counts . . . were based on a single 'unit of prosecution.'" *Id.* at 187-88. The Court explained:

> In determining the appropriate unit of prosecution under a criminal statute, we look to Congress, asking whether it clearly manifested an intention to punish a defendant twice for continuous possession of a firearm in furtherance of co-terminous predicate offenses involving essentially the same conduct. Where ambiguity or doubt exists about Congressional intent regarding the unit of prosecution, we apply the rule of lenity, which dictates that "if Congress does not fix the punishment for a federal offense clearly and without ambiguity, doubt will be resolved against turning a single transaction into multiple offenses."

*Id.* at 188 (quoting *Finley*, 245 F.3d at 207).

The *Wallace* court explained that one § 924(c) count (Count Thirteen) was predicated on the government proving that the defendant knowingly used a firearm during and in relation to a drug trafficking offense, and in the course of using it, caused the murder of Torres; the other § 924(c) count (Count Fourteen) was predicated on the government proving that the defendant fired a weapon, in furtherance of a major drug offense, into a group of two or more people with the intent to injure, and in the course of doing so, caused the murder of Torres. *Id.* at 189-90. "The relevant conduct underlying the offenses predicating Counts Thirteen and Fourteen consists of the same shooting." *Id.* at 189. Thus, the underlying predicates were distinct crimes charged under different statutes, but the court concluded that the firearm was possessed or used in furtherance of simultaneous predicate offenses consisting of virtually the same conduct.

However, in *Mejia*, 545 F.3d 179, the Second Circuit allowed the separate § 924(c) convictions to stand. In *Mejia*, the defendant fired at a crowd in a parking lot from inside a van, hitting two individuals. *Id.* at 183. He and his co-defendants then drove to another parking lot, where the defendant handed the gun to another occupant of the van, who shot a third victim in the second parking lot. *Id.* at 184. The defendant was charged with three separate VICAR counts of assault to maintain his position in a racketeering enterprise based on the three separate victims, in violation of 18 U.S.C. § 1959(a)(3), and with three separate § 924(c)(1)(A)(iii) counts based on each of the § 1959(a)(3) charges. *Id.* The Second Circuit rejected the notion that the shootings were a single incident, finding that while they were "clustered in time and space, that clustering does not somehow merge them into one predicate crime." *Id.* at 205-06. The court recognized *Finely* and *Wallace*

as the exception to the general rule set forth in *Lindsay* that the appropriate unit of prosecution for a § 924(c) count is the predicate offense (i.e., the underlying crime of violence or the drug trafficking crime), and concluded that none of the unique concerns at play in *Finley* and *Wallace* were present so as to justify departing from the general rule. *Id.* at 205-06; *see also United States v. Salameh*, 261 F.3d 271, 279 (2d Cir. 2001) (rejecting multiplicity challenge to two § 924(c) convictions—one based on conspiracy to bomb World Trade Center by, *inter alia*, transporting bomb to the site, and the other based on assaulting Secret Service Agents by using the bomb to damage the World Trade Center).

### D.     The Court's Conclusions

Several legal principles can be distilled from the above discussion, leading to the Court's conclusion that Defendants' multiplicity challenges to their § 924(c) convictions must be denied because each is linked to a distinct crime.

First, the possession of a single firearm with simultaneous predicate offenses consisting of virtually the same conduct cannot serve as the basis for separate § 924(c) convictions, even where the underlying conduct is charged separately under different statutory provisions. This principle is most relevant to the multiplicity challenge to Counts 5 and 6, based upon Jenkins' use of one firearm to murder both Maue and Szymanski on September 6, 2014, at the North Tonawanda Chapter clubhouse. The Court concludes that this case is more similar to the scenario presented in *Mejia*, as opposed to *Finley* (involving "virtually the same conduct with the same criminal motivation") or *Wallace* (involving the same murder). Like *Mejia*, the unit of prosecution for Counts 5 and 6 is the VICAR statute (in *Mejia*, the unit of prosecution was 18 U.S.C. § 1959(a)(3); here the unit of prosecution

is 18 U.S.C. §§ 1959(a)(1) and 2). Also like *Mejia*, there are multiple shooting victims (in *Mejia*, three victims were assaulted with firearms; here, two victims were murdered). *See Mejia*, 545 F.3d at 183-84. By comparison, in *Finley* and *Wallace*, while different statutes served as the basis for the underlying predicates of the § 924(c) charges, the conduct was virtually the same. *See Finley*, 245 F.3d at 207; *Wallace*, 447 F.3d at 189. In other words, the conduct drives the result, and here, there were two separate murders constituting two separate crimes. Even though only one firearm was involved and even though the murders occurred during a single criminal episode lasting a brief period of time, *Mejia* precludes Defendants' multiplicity arguments as to Counts 5 and 6: the "clustering" in time and space of the shootings "does not somehow merge them into one predicate crime." 545 F.3d at 205-06. The principles set forth by *Finley* and *Wallace* do not stand for the proposition that a defendant may escape the consecutive punishments imposed by § 924(c) because he utilizes a single firearm to murder two individuals at or about the same time. The murders were separate offenses constituting distinct crimes, and thus, they each may serve as the basis for a separate § 924(c) conviction.

Second, separate § 924(c) convictions cannot be based on units of prosecution that are the same crimes for double jeopardy purposes, including as lesser-included offenses. This principle relates most directly to Defendants' multiplicity challenge to the § 924(c) conviction on Count 2 (based upon the underlying racketeering conspiracy). As noted above, the racketeering activity alleged as part of Count 1's conspiracy also served, in part, as the basis for separate substantive counts charged in Counts 3, 4, and 8, that supported three additional § 924(c) charges in Counts 5, 6, and 9, respectively. While *Whyte* suggests

that the substantive counts here may be lesser-included offenses of the racketeering conspiracy and thus would raise double jeopardy issues, 630 F. App'x at 109, this Court respectfully disagrees. *Whyte* is a non-precedential summary order and "is therefore not binding on this Court." *United States v. Wider*, 184 F. Supp. 3d 10, 16 (E.D.N.Y. 2016); *see also* 2d Cir. L. R. 32.1.1 ("Rulings by summary order do not have precedential effect."). Pursuant to binding Second Circuit precedent, Counts 3, 4, and 8 are not lesser-included offenses of the racketeering conspiracy charged in Count 1. *See Basciano*, 599 F.3d at 196-97; *Thomas*, 757 F.2d at 1371. The substantive counts charged in Counts 3, 4, and 8 are not the same in law as the conspiracy charged in Count 1—Counts 3, 4, and 8 each require proof of an element not contained in Count 1, and Count 1 requires proof of an element not contained in Counts 3, 4, and 8. *See United States v. Dixon*, 509 U.S. 688, 696 (1993); *Blockburger v. United States*, 284 U.S. 299, 304 (1932). Thus, double jeopardy principles do not, in the Court's view, preclude imposition of separate § 924(c) convictions based upon these four separate counts.

Nonetheless, there is a third general principle that the Court must consider. *Arline* suggests that the Court must examine whether the conduct at issue with each § 924(c) conviction is distinct, separate and apart from any double jeopardy analysis. 835 F.3d at 282-83. Here, the Court concludes that the evidence that served as the basis for each § 924(c) count was not the same. The murder of Paul Maue served as the basis for the Count 5 conviction, and the murder of DJ Szymanski served as the basis for the Count 6 conviction. For Count 2, the jury was instructed that it was based upon the allegation that Count 1 was a crime of violence, and accordingly to convict on Count 2, the jury needed

to conclude that an object of the conspiracy was a crime of violence. Because of the special interrogatories that were answered for Count 2, it is evident that the jury concluded with respect to Count 2 that each Defendant actually agreed to the commission of at least one crime of violence having nothing to do with the murders of Maue and Szymanski (for all three Defendants, murder under Florida law, and additionally Hobbs Act robbery for Pirk). (See Dkt. 1258).[14] The murder allegations under Florida law were related to the dispute with the Pagans in 2014, and the Hobbs Act robbery was related to the incident involving the shutdown of the Springville Chapter on or about June 7, 2013. Thus, all three Defendants were convicted of a firearm offense in violation of § 924(c) as charged in Count 2 for conduct separate and distinct from the murders of Paul Maue and DJ Szymanski.

Moreover, while the drug trafficking offense that served as the basis for the charge in Count 8 also was alleged as part of the racketeering activity in Count 1, the § 924(c) count charged in Count 9 was linked to a drug trafficking unit of prosecution (Count 8), whereas the § 924(c) count charged in Count 2 was linked to an alleged crime of violence (Count 1). Again, the jury was specifically instructed that in order to convict on Count 2, it needed to conclude that objective(s) of the RICO conspiracy included crime(s) of violence, whereas no such instruction was provided for Count 9. Additionally, the Government specifically argued during its closing argument (both initially and then even more directly during rebuttal) that the charges in Count 2 concerning the possession of

---

[14]     The presence of the special interrogatories, while helpful to deciding the issue, is not critical to the determination, because the Second Circuit has held that "the existence of a 'second or subsequent' § 924(c) conviction is a sentencing factor that need not be determined by a jury." *Arline*, 835 F.3d at 280.

firearms were related to the fact that KMC members needed to possess firearms to allow the club to function in the way it did and stand up to rivals—whether it be the incident with the Pagans in Florida in 2014, the incident with the Outlaws in Tennessee in May 2014, or the incident with the defecting Springville Chapter in June 2013—whereas the possession of firearms inside the South Buffalo Chapter clubhouse and fortifying that clubhouse where drug possession and dealing was occurring related to the charges in Count 9.

In sum, the Government produced evidence of Defendants' firearm possession on multiple occasions and at different times and places; there was evidence that firearms were possessed inside many of the KMC clubhouses, in Tennessee during the meeting with the Outlaws, in Florida during the meeting with the Pagans, in New York during the Springville Chapter shutdown, during the murders of Paul Maue and DJ Szymanski, and at various other times and places. Firearms were tools of the trade for KMC members, including Jenkins, Pirk and Enix. The evidence produced at trial demonstrated that Defendants and other KMC members possessed firearms in Florida, Tennessee, and New York sufficient to conclude that the firearms were "neither linked 'to a single crime,' nor based on the 'continuous possession of a firearm in furtherance of simultaneous predicate offenses consisting of virtually the same conduct.'" *Arline*, 835 F.3d at 282 (quoting *Lindsay*, 985 F.2d at 674, then *Wallace*, 447 F.3d at 188). While the time period in Count 9 overlapped with Count 2, and while the murders at issues in Counts 5 and 6 occurred

during the time of the conspiracy, there was sufficient evidence of separate conduct to allow the four separate § 924(c) convictions to stand.[15]

Accordingly, for the foregoing reasons, Defendants' motions in support of setting aside the convictions under 18 U.S.C. § 924(c) based on multiplicity grounds, are denied.

## IX. PIRK'S CHALLENGE UNDER RULE 29(c) TO COUNTS 1 THROUGH 6 BASED ON INSUFFICIENT ACCESSORIAL LIABILITY

Pirk argues that the Court should vacate his convictions on Counts 1 through 6—all of which, in his view, were dependent in whole or in part on his role in the killings of Maue and Szymanski—because there was no proof beyond a reasonable doubt that he aided, abetted, counseled, commanded, induced, or procured Jenkins to murder them. (Dkt. 1325-1 at 5-10).

Viewing the evidence in the light most favorable to the Government, which the Court must do, the Court rejects Pirk's argument. There was ample evidence adduced at trial to support the jury's finding that Pirk aided or abetted the murders of Maue and Szymanski, including, but not limited to, the following: (1) testimony from co-conspirators Roger Albright and Joseph Michael Long that Jenkins told each of them that Pirk told Jenkins to "take care of it" in reference to killing Maue and Szymanski; (2) testimony from Thomas Koszuta (another co-conspirator) that, after the murders, Pirk stated that Jenkins killed Maue and Szymanski and did what he had to do; (3) testimony from Robert Osborne and Emmett Green that Pirk instructed KMC members to delete video from the clubhouses

---

[15]     The Court notes that there was no request by Defendants to "give a specific jury instruction or to pose an interrogatory as to the firearms at issue" in each of the § 924(c) counts. *See United States v. Barnes*, 560 F. App'x 36, 43 (2d Cir. 2014).

that would put Jenkins at the clubhouse shortly after the murder; (4) testimony that Pirk instructed the Tennessee KMC members not to retaliate against Jenkins for killing Maue and Szymanski; (5) evidence demonstrating that Pirk and Jenkins travelled to New York together and surreptitiously met prior to the murders; (6) Jenkins' instructions to Rene Faulkner as he was leaving right before the murders to call Pirk using his "burner phone" if anything happened; and (7) Pirk's telephone call to Maue right before he was murdered. When considered with the significant evidence of a coverup encouraged by Pirk after the murders, there was more than enough evidence for the jury to find that Pirk aided and abetted the murders.

## X.    PIRK'S *ROSEMOND*-BASED CHALLENGE TO COUNTS 5 AND 6

Pirk argues that his convictions on Counts 5 and 6—the § 924(j) counts related to the VICAR murder counts set forth in Counts 3 and 4—must be set aside under Rule 29(c) because he had no advance knowledge that Jenkins would carry a firearm when he killed Maue and Szymanski. (Dkt. 1325-1 at 10-11). In support of this argument, Pirk cites *Rosemond v. United States*, 572 U.S. 65 (2014). In that case, the Supreme Court held that, to aid and abet a § 924(c) offense, the defendant must have advance knowledge that one of his confederates will carry a gun, such that he still realistically could have opted out of the crime. *Id.* at 78.

Viewing the evidence in the light most favorable to the Government, the Court rejects Pirk's argument. The jury was instructed in accordance with *Rosemond*, and it returned a verdict of guilt as to Pirk on Counts 5 and 6. Based upon the evidence presented

at trial, a reasonable jury could conclude that Pirk knew that Jenkins would be carrying a firearm and would use a firearm during the murders of Maue and Szymanski.

## XI. JENKINS' MOTION TO VACATE HIS CONVICTIONS ON COUNTS 3 AND 4

Jenkins argues that the Court should vacate his convictions on Counts 3 and 4, the VICAR counts involving the murders of Maue and Szymanski, "because they were not in furtherance of the RICO conspiracy alleged to have involved the [KMC]." (Dkt. 1326 at 4). In his view, the fact that other members of the KMC wanted to retaliate against him for committing the murders means that the murders could not have been for the purpose of maintaining or increasing his position in the KMC enterprise, which was engaged in racketeering activity. (*See id.* at 4-5).

Considering the evidence in the light most favorable to the Government, the Court rejects Jenkins' argument. Jenkins' motion challenges the Government's proof that the murders were to maintain or increase his position within the KMC. (*See id.*). Based on the evidence presented at trial, a reasonable jury could conclude that the evidence demonstrated that Pirk ordered Jenkins to carry out the murders in order to retaliate against what was believed to be Maue's and Szymanski's betrayal of the KMC, and that Jenkins carried out that order and, as some witnesses testified, "did what he had to do." From those circumstances, the jury could reasonably conclude that Jenkins carried out the murder at the request of the KMC's National President in order to maintain his position within the KMC enterprise—in other words, he was following orders, and carrying out those orders was expected of him by virtue of his membership in the KMC. In fact, Jenkins was

witnessed leaving the scene of the murders yelling "LKDK" (meaning "Live a Kingsman, Die a Kingsman")—representing direct evidence that the murders were linked to Jenkins' role within the KMC. Thus, the motive element of the VICAR counts was satisfied in this case. *United States v. Thai*, 29 F.3d 785, 817 (2d Cir. 1994) ("The motive requirement is thus satisfied if 'the jury could properly infer that the defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership.'" (quoting *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992))); *see also United States v. Krasniqi*, 555 F. App'x 14, 18 (2d Cir. 2014) (finding motive element satisfied where defendants killed a fellow member of an enterprise who the defendants believed had betrayed the enterprise, such that killing was done to maintain defendants' leadership in the enterprise and to punish for disloyalty).

## XII. DEFENDANTS' RULE 33 ARGUMENTS

### A. Enix's Rule 33 Arguments

Enix argues that a new trial is necessary for two reasons: (1) the jury did not unanimously agree that he joined the same racketeering conspiracy as his co-defendants; and (2) the interest of justice weighs in favor of a new trial on all counts against him because he is not guilty. (Dkt. 1322-1 at 44-46). Those arguments echo those raised in support of Enix's Rule 29 motion, discussed previously. For the same reasons the Court rejects Enix's Rule 29 motion, he has failed to show the "extraordinary circumstances" necessary to warrant a new trial under Rule 33.

## B.    Pirk's Rule 33 Arguments

Pirk argues that he is entitled to a new trial because of two purported flaws in Caruso's testimony: (1) Caruso gave inconsistent testimony about Pirk's alleged request to have Caruso kill Maue; and (2) Caruso's testimony was patently unbelievable in light of his criminal history, perjury, and admitted willingness to lie to advance his own interests. (Dkt. 1325-1 at 19-20).

However credible Caruso may or may not be, his testimony is not an "extraordinary circumstance" warranting a new trial. Caruso was one of dozens of Government witnesses, and even setting aside his testimony, there was more than sufficient proof of Pirk's guilt on the charges of which he was convicted. Accordingly, no new trial is warranted on this basis.

## C.    Jenkins' Rule 33 Arguments

Jenkins argues that he is entitled to a new trial for two reasons: (1) Enix elicited testimony from FBI Special Agent Samuels ("Agent Samuels") and also presented his own testimony, that he thanked the FBI agents for "getting the guy" that committed the murders, and Enix was permitted to testify that his opinion as to who committed the murders had changed by the time he was arrested; and (2) the Government presented evidence of cell-site location information from Jenkins' cellphone that was obtained without a warrant, in violation of *Carpenter v. United States*, 138 S. Ct. 2206 (2018). (Dkt. 1326 at 6-8). The Court considers each argument in turn.

### 1. Enix's Testimony

Enix was permitted to testify during his direct examination, over the objections of Jenkins' counsel, that when he was arrested on March 22, 2016, and was being transported to the federal courthouse by Agent Samuels, he thanked her "for getting the guy that killed Paulie and DJ." The Court gave a limiting instruction to the jury during the testimony that it was introduced for purposes of showing Enix's state of mind, and it was not admitted to show who allegedly committed the murders.

In addition, the Government elicited testimony from Agent Samuels that Enix thanked the FBI for "getting the guy" who committed the murders. The Court instructed the jury that the evidence could only be considered with respect to Enix, and that it was not being admitted to prove that anyone committed the murders.

According to Jenkins, the prejudice resulting from the testimony of Agent Samuels and Enix is two-fold: the jury is bound to believe the testimony of a co-defendant casting blame on another, and, had Jenkins known the testimony would have been elicited, he would have moved for severance or pursued an alternative defense strategy. (Dkt. 1326 at 7). In his view, this warrants a new trial. The Court disagrees.

First, the evidence of Jenkins' guilt was overwhelming. No objective view of the evidence in this case could lead to the conclusion that Enix's statement to Agent Samuels somehow influenced the jury's verdict with respect to Jenkins' guilt.

Second, nothing about Enix thanking the FBI for "getting the guy" or changing his mind about who committed the murders implicated Jenkins in particular. To the extent that Jenkins now argues that the testimony raised a *Bruton* issue, the Court disagrees, as it

did previously when denying Jenkins' motion for severance. *See United States v. Pirk*, 284 F. Supp. 3d 398, 410-412 (W.D.N.Y. 2018). As the Court explained previously in that decision, in *Richardson v. Marsh*, 481 U.S. 200 (1987), the Supreme Court limited the scope of *Bruton v. United States*, 391 U.S. 123 (1968), concluding that the *Bruton* doctrine applies to a co-defendant confession that is "incriminating on its face." *Id.* at 208 ("There is an important distinction between this case [*Richardson*] and *Bruton*, which causes it to fall outside the narrow exception we have created. In *Bruton*, the co-defendant's confession 'expressly implicat[ed]' the defendant as his accomplice. Thus, at the time that confession was introduced there was not the slightest doubt that it would prove 'powerfully incriminating.' By contrast, in this case the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial (the defendant's own testimony)." (alteration in original)); *accord United States v. Lung Fong Chen*, 393 F.3d 139, 148 (2d Cir. 2004) ("In *Richardson v. Marsh*, 481 U.S. 200 (1987), the Court limited the reach of *Bruton* by holding that when a confession is redacted so that it does not facially incriminate the defendant, its admission with a proper limiting instruction does not violate the Confrontation Clause."). Neither the statements concerning Enix thanking the FBI for "getting the guy" nor Enix's testimony about changing his mind about the identity of the perpetrator expressly incriminated Jenkins.

Third, the statements made by Enix came in only for the jury's consideration of Enix, and the jury was specifically instructed that the statements should not be considered in connection with the jury's evaluation of Jenkins' guilt. Indeed, as part of the Court's final instructions, it charged the jury that guilt is individual and that the verdict of guilty or

not guilty must be determined separately with respect to each Defendant and based solely upon the evidence—or lack of evidence—presented against the Defendant under consideration and without regard to the guilt or non-guilt of anyone else.

Finally, the suggestion that somehow Jenkins would have moved for severance or pursued an alternative defense strategy if he had been armed with knowledge concerning the statement's admission represents revisionist history of the pretrial proceedings in this case. Jenkins cited to the statement in support of his severance motion (Dkt. 792 at 5), and the Court denied that motion without any concession on the part of the Government that the statement would not be introduced (*see* Dkt. 998). Rather, the relevant severance-related pretrial concession on the part of the Government was its agreement not to seek to introduce Jenkins' state-court murder conviction as part of its case-in-chief in the event that the Court deemed the introduction of that conviction a sufficient basis to grant severance. (Dkt. 803 at 11). During trial the Government indicated that it might not elicit testimony from Agent Samuels concerning the statement, but ultimately the Government did elicit the testimony because of the Court's decision that Enix could elicit the testimony subject to an appropriate limiting instruction. Thus, the suggestion that the introduction of this testimony somehow represented a sea change in the course of the trial is simply not supportable. In addition, the simple presence of antagonistic defenses[16] does not, as a

---

[16]    Contrary to Jenkins' argument, the Court rejects the notion that Enix's testimony somehow constituted evidence of a mutually antagonistic defense to Jenkins. The acceptance of the veracity of Enix's testimony—that his opinion concerning the identity of the individual who committed the murders had changed over time—did not necessarily preclude acceptance of Jenkins' defense that he did not commit the murders. *See United States v. Yousef*, 327 F.3d 56, 151 (2d Cir. 2003) ("Defenses are mutually antagonistic

- 44 -

matter of law, mandate severance. *Zafiro v. United States*, 506 U.S. 534, 538-39 (1993)

("Mutually antagonistic defenses are not prejudicial *per se*. Moreover, Rule 14 does not

require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to

be granted, if any, to the district court's sound discretion.").

Accordingly, this testimony does not constitute an extraordinary circumstance

warranting a new trial.

### 2. *Carpenter*-Based Arguments

At trial, the Government introduced cell tower location mapping covering a seven-

day period of September 1 through 7, 2014, for Jenkins' identified cell phone. (*See* Gov't

Trial Ex. 3584.2). In *Carpenter*, the Supreme Court held that the acquisition of cell-site

location information is a search for Fourth Amendment purposes, and, as a result, "the

Government must generally obtain a warrant supported by probable cause before acquiring

such records." 138 S. Ct. at 2221. The Supreme Court issued its decision on June 22,

2018, over a month after the jury returned its verdict against Jenkins.

In this case, the Government represents that it relied on the Stored Communications

Act ("SCA"), 18 U.S.C. §§ 2701 *et seq.*, in order to obtain the cell site location information

to which Jenkins now objects. (Dkt. 1371 at 21). The SCA "required the Government to

show 'reasonable grounds' for believing that the records were 'relevant and material to an

ongoing investigation.'" *Carpenter*, 138 S. Ct. at 2221 (quoting 18 U.S.C. § 2703(d)).

"That showing falls well short of the probable cause required for a warrant. The Court

---

when accepting one defense requires that the jury must of necessity convict a second
defendant." (quotation and citation omitted)).

usually requires 'some quantum of individualized suspicion' before a search or seizure may take place." *Id.* (quoting *United States v. Martinez–Fuerte*, 428 U.S. 543, 560-61 (1976)). Accordingly, the procedure on which the Government relied is now invalid.

The Government argues that it acted in good faith when it relied on the subsequently invalidated warrantless procedure for obtaining cell site location information. (Dkt. 1371 at 21). The Second Circuit has confirmed that the good faith exception to the exclusionary rule set forth in *United States v. Leon*, 468 U.S. 897, 919-21 (1984), applies to government reliance on the now invalid warrantless procedure under the SCA. *United States v. Chambers*, No. 16-163-cr, ___ F. App'x ___, 2018 WL 4523607 (2d Cir. Sept. 21, 2018). In fact, the Second Circuit has recognized the applicability of the good faith exception even when cell-site records were obtained pursuant to a subpoena as opposed to an SCA order. *See United States v. Zodhiates*, 901 F.3d 137, 143-44 (2d Cir. 2018).

Moreover, unlike the defendants in *Carpenter*, *Chambers*, and *Zodhiates*, Jenkins never moved to suppress the cell phone evidence in this case. *See United States v. Yousef*, 327 F.3d 56, 144 (2d Cir. 2003) (failure to raise argument concerning suppression pre-trial constituted waiver under Fed. R. Crim. P. 12(b)(3) where no good cause shown). Jenkins has failed to demonstrate good cause for his failure to raise the suppression issue pretrial. While *Carpenter* was not decided until after the trial, the raising of the issue pretrial by the defendant in that case (as well as in the *Chambers* and *Zodhiates* cases) demonstrates that the issue could have been raised pretrial. *See, e.g., United States v. McCullough*, No. 12-539-CR, 523 F. App'x 82, 83 (2d Cir. Apr. 23, 2013) (failure to move to suppress cell-site records in advance of trial constitutes waiver); *see also United States v. Thomas*, 897

F.3d 807, 815 (7th Cir. July 26, 2018) (failure to raise motion to suppress cell-site location information pre-trial not supported by good cause; uncertainty concerning legal issue prior to *Carpenter* did not constitute good cause).

Finally, the evidence of Jenkins' travels between September 1, 2014, and September 7, 2014, as depicted by Government Exhibit 3584.2, was separately corroborated by other evidence introduced in the case, including eyewitness testimony from numerous witnesses. Therefore, the admission of the evidence (even if in error) was harmless beyond a reasonable doubt.

## XIII.  CONCLUSION

For the foregoing reasons, the Court denies Defendants' post-verdict motions (Dkt. 1322; Dkt. 1325; Dkt. 1326), except for Defendants' challenges based upon *Sessions v. Dimaya*, ___ U.S. ___, 138 S.Ct. 1204 (2018), to their convictions on Count 2 under 18 U.S.C. §§ 924(c)(1)(A)(i) and 2, and on that issue the Court continues to reserve decision and will issue a separate Decision and Order.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:  December 19, 2018
        Rochester, New York