UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

DAVID PIRK, ANDRE JENKINS, a/k/a
Little Bear, TIMOTHY ENIX, a/k/a Blaze,

Defendants.

**DECISION AND ORDER**

1:15-CR-00142 EAW

---

Following a four-month jury trial, Defendants David Pirk ("Pirk"), Andre Jenkins ("Jenkins"), and Timothy Enix were convicted of eight, nine, and four counts, respectively, including a conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.*, in connection with the operation of the Kingsmen Motorcycle Club ("KMC"). During the trial, Jenkins filed two motions for a mistrial, and Pirk filed one. (Dkt. 1141 (Jenkins); Dkt. 1174 (Pirk); Dkt. 1245 (Jenkins)). The Court orally denied all three mistrial motions but indicated at the time that it would issue a written decision after the trial confirming its rulings. This Decision and Order constitutes that written decision. Familiarity with the underlying facts of the case is assumed for purposes of this Decision and Order.

Trial court judges "may declare a mistrial whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for doing so." *Renico v. Lett*, 559 U.S. 766, 773-74 (2010) (internal quotation marks omitted). "[T]he manifest necessity standard cannot be interpreted literally, and . . . a mistrial is appropriate when there is a high degree of necessity." *Id.* at 774 (internal quotation marks omitted). "The

decision to declare a mistrial is left to the sound discretion of the judge, but the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes." *Id.* (internal quotation marks omitted). "[A] mistrial is warranted only upon a showing of actual prejudice." *United States v. Gaskin*, 364 F.3d 438, 463 (2d Cir. 2004).

Jenkins' and Pirk's motions for a mistrial arose out of three different occurrences during the trial: the testimony of Lieutenant Daryl Truty ("Truty") of the North Tonawanda Police Department (Dkt. 1141); an extraneous comment made by Government witness Filip Caruso ("Caruso") (Dkt. 1174); and the Government's decision not to call two witnesses, despite having referenced those witnesses in its opening statement (Dkt. 1245). For the reasons previously stated on the record and as set forth below, Jenkins' and Pirk's motions for a mistrial are denied.

### Lieutenant Truty's Testimony

At the time of the murders of Paul Maue and Daniel Szymanski on September 6, 2014, Truty was a detective with the North Tonawanda Police Department. He was assigned to investigate the murders. Truty testified during the trial on March 16 and 19, 2018, explaining that he arrived at the KMC North Tonawanda clubhouse in the early morning hours on September 6, 2014. Truty testified about his efforts to identify (and rule out) potential suspects, and he testified concerning his retrieval of video evidence at both the clubhouse and Betty's Bar, ultimately laying the foundation for the admission into evidence of Government Exhibit 5—a composite video matching the pertinent video from Betty's Bar and the KMC clubhouse in a linear, concise timeline.

Truty testified about various segments of the video, and at the portion of the video after the murders occurred, when Jenkins appears to be arriving back at Betty's Bar, he testified that Jenkins' jeans were different in appearance than earlier in the video because they appeared to have dark stains, consistent with blood. Jenkins' counsel objected to the testimony on the ground that the video was black-and-white,[1] but the Court overruled the objection indicating that it was a fair ground for cross examination but did not justify precluding the testimony. Jenkins' counsel cross-examined Truty concerning this testimony.

After Truty testified, Jenkins filed a motion for a mistrial on March 20, 2018. (Dkt. 1141).[2] Jenkins argued that Truty's testimony concerning the stains on Jenkins' jeans constituted an improper expert or lay witness opinion and was therefore inadmissible. (*Id.* at ¶¶ 7-14). Jenkins contended that, although the existence of blood stains on Jenkins' jeans was crucial to the Government's proof, only one other Government witness—Rene

---

[1] There were two videos from Betty's Bar—one depicting the inside of the bar and one depicting the outside. Truty testified that the video inside Betty's Bar was black-and-white, but the video outside of the bar was "infrared." The video at issue was the one from outside the bar; it appeared to show contrasts and reflected lightness and darkness, but it did not depict actual color.

[2] The motion filed by Jenkins purports to quote from the trial transcript, but this was in error because no certified transcript of the testimony was prepared at the time the motion was filed. Defense counsel relied on the uncertified rough transcript created through real time transcription that was provided by the undersigned's court reporter to the parties as a courtesy. At present, a certified transcript of Truty's testimony has not been filed and therefore the Court's recitation of his testimony is based upon its notes. Of course, once prepared, if the certified transcript differs in any respect from the recitation contained herein, the transcript controls.

Faulkner—corroborated Truty's testimony that Jenkins' jeans were bloodstained, and the Government had "no lab results, DNA testing, or other physical evidence" to support the notion that the jeans were bloodstained.³ (*Id.* at ¶¶ 19-20). Jenkins argues that those circumstances rendered the testimony so highly prejudicial that a curative instruction would not suffice. (*Id.* at ¶¶ 16, 18, 22).

The Government opposed Jenkins' motion for a mistrial, contending that Truty's testimony qualified as lay opinion testimony under Federal Rule of Evidence 701. (Dkt. 1145 at 3-4). The Government pointed out that Truty was one of the North Tonawanda Police Department's primary investigators of the murders. (*Id.* at 2). He "reviewed countless hours of video," frame by frame, from the North Tonawanda KMC Chapter clubhouse and Betty's Bar, prepared a composite exhibit of the videos, took still photographs from the videos, and created a timeline of events that was admitted into evidence. (*Id.*).

The Government contended that the testimony constituted a lay opinion based upon Truty's perceptions in viewing the video, and it was helpful to the jury because Defendants attacked the thoroughness of the investigation, suggesting that law enforcement ignored other evidence and only pursued Jenkins as the killer, and Truty's observations that Jenkins' appearance had changed after the murders explained why the focus turned to Jenkins. (*Id.* at 4).

---

³ The testimony, including from Roger Albright and Rene Faulkner, supported the conclusion that Jenkins burned his jeans after returning to the KMC Olean clubhouse following the murders.

In reply, Jenkins argued that the testimony failed to qualify as lay opinion testimony because Truty lacked first-hand knowledge of whether Jenkins' jeans were bloodstained, and as a result, the testimony did not meet Rule 701's rational basis requirement. (Dkt. 1146 at 1). Jenkins further argued that the testimony failed to meet Rule 701's helpfulness requirement because Truty "simply told the jury what result to reach." (*Id.* at 2).

The Court agreed with the Government that Truty's testimony was permissible lay opinion testimony under Rule 701. Even though Truty may have qualified as an expert witness on certain subjects, he was not offered by the Government as an expert witness. *See United States v. LeCroy*, 441 F.3d 914, 927 (11th Cir. 2006) (crime scene specialist's testimony that blood stain on shirt appeared to have been made by someone wiping bloody knife on shirt constituted lay witness opinion, not expert witness opinion). Rather, Truty testified as a lay witness about his personal observations.

Rule 701 permits lay witnesses to offer opinion testimony under the following circumstances: (1) the testimony is "rationally based on the witness's perception"; (2) the testimony is "helpful to clearly understanding the witness's testimony or to determining a fact in issue"; and (3) the testimony is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Truty's testimony satisfied all three of Rule 701's requirements.

First, Truty's testimony was rationally based on his perception of the video. *See* Fed. R. Evid. 701(a). Rule 701's first "requirement is the familiar requirement of first-hand knowledge or observation." *United States v. Glenn*, 312 F.3d 58, 67 (2d Cir. 2002) (internal quotation marks omitted). Truty spent countless hours reviewing the video frame-

by-frame and he observed that, after the murders, Jenkins' jeans appeared to contain dark stains that were consistent with the appearance of blood. At no time did Truty opine that the stains were red in color, nor was the jury somehow led to believe that color could be viewed on the video—it clearly could not and defense counsel thoroughly cross-examined Truty on this point and the limits of his testimony in this regard. However, Truty plainly had firsthand knowledge about the various scenes in the video, including the change in the appearance of Jenkins' jeans after the murders. This situation is not comparable to the case relied upon by Jenkins—*United States v. Kaplan*, 490 F.3d 110 (2d Cir. 2008)—holding that it was error to admit a witness's opinion that the defendant knew of the fraud where the witness failed to adequately identify facts that he had observed to support a conclusion that he had firsthand perceptions and that his opinion was rationally derived from those firsthand perceptions. *Id.* at 119. Here, Truty had firsthand knowledge about the scenes in the video. Admittedly, that knowledge was limited by the video's lack of color—but Truty never opined as to the color of the stains that he observed.

Second, Truty's testimony was helpful to determining a fact in issue. *See* Fed. R. Evid. 701(b). "Rule 701's helpfulness requirement is designed to provide assurance against the admission of opinions which would merely tell the jury what result to reach." *United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992) (internal quotation marks and alteration omitted).

> Where the jury is "in as good a position as the witness to draw the inference" to which the opinion relates, the opinion is not helpful and should not be admitted. By contrast, when an opinion is the result of factors not otherwise possessed by or communicated to the jury, the opinion testimony is likely to be helpful.

*United States v. Arroyo*, 600 F. App'x 11, 15 (2d Cir. 2015) (quoting *Rea*, 958 F.2d at 1216) (citation omitted). Here, Truty's opinion was helpful in at least two respects. First, his testimony was the result of insight that the jury did not possess—having viewed the video frame-by-frame—and reflected his observations concerning Jenkins' appearance both before and after the murders. Defense counsel clarified during the oral argument related to this motion during the trial (on March 20, 2018), that the real crux of Jenkins' objection related to the fact that the video at issue did not depict color. However, that in and of itself did not make the testimony inadmissible—it certainly went to the weight of the testimony and limited the extent of Truty's observations, which defense counsel thoroughly explored during cross examination—but it did not render the testimony inadmissible.

Second, separate and apart from whether the testimony was helpful to determining whether there were stains on Jenkins' jeans, the testimony was also helpful in rebutting the defense attacks on the thoroughness of the investigation and allowing the jury to understand the course of the investigation. As explained by the Government in its response to Jenkins' motion, explaining in part why it sought to elicit the testimony:

> Here, the defense has raised questions at every turn as to why the North Tonawanda Police Department promptly focused in on identifying Rene Faulkner and identifying Andre Jenkins after the murders. The answer is based upon Detective Truty's review of the video and rationally based perception that, immediately before the murders, there were no stains on defendant Jenkins's pants and, within minutes after the murders, there were dark stains on defendant Jenkins's pants that the investigating detective believed to be blood. Thus, Detective Truty's opinion is highly probative because it set the stage for the investigation that followed, and is no doubt

> helpful to a clear understanding of the witness' testimony and to a determination of a fact in issue.

(Dkt. 1145 at 4). The defense could not, on the one hand, attack the thoroughness of the investigation and claim that the investigators at the scene ignored evidence and failed to preserve the crime scene, and then on the other hand seek to preclude testimony from the primary investigator explaining why early on in the investigation he ruled out other suspects and focused on Jenkins.

With respect to the third factor under Rule 701, Truty's testimony was not based on specialized knowledge. *See* Fed. R. Evid. 701(c). His opinion as to the state of Jenkins' jeans "was informed by reasoning processes familiar to the average person in everyday life rather than by scientific, technical, or other specialized knowledge." *United States v. Garcia*, 413 F.3d 201, 216 (2d Cir. 2005). Visual observation is a matter of the senses and derives from a process of reasoning familiar in everyday life:

> The prototypical example of the type of evidence contemplated by the adoption of Rule 701 relates to *the appearance of persons or things*, identity, the manner of conduct, competency of a person, *degrees of light or darkness*, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences.

*Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 241 (6th Cir. 2010) (emphasis added) (quoting *Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1196 (3d Cir. 1995)).

> Thus, a lay witness may testify, for example, that "a footprint in snow looked like someone had slipped, or that a substance appeared to be blood[,]" but cannot testify that "skull trauma caused the bruises on a victim's face."

*Id.* (quoting *United States v. White*, 492 F.3d 380, 401 (6th Cir. 2007)).

Here, Truty's observation reflected no specialized or technical knowledge. In fact, the Court specifically gave an instruction concerning lay witness testimony as part of its final charge stating, in part, that Truty's testimony was not based upon special knowledge, skill, experience and training; that his opinion should receive whatever weight the jury thought was appropriate; and that the opinion should not substitute for the jury's own reason, judgment and common sense because the facts in the case rested solely with the jury.

For those reasons, Truty's testimony qualified as lay opinion testimony under Rule 701. However, even assuming that Truty's testimony failed to satisfy the requirements of Rule 701, the admission of his testimony did not create a "manifest" or "high degree of necessity" warranting a mistrial. *Renico*, 559 U.S. at 774. As discussed, a trial court should exercise its discretion to declare a mistrial with "greatest caution, under urgent circumstances, and for very plain and obvious causes." *Id.* (internal quotation marks omitted). Defendants cross-examined Truty and thoroughly probed his opinion about the stains on Jenkins' jeans. Moreover, Truty's testimony was not the only evidence from which the jury could conclude that Jenkins committed the murders—indeed, the evidence elicited during this four-month trial connecting Jenkins to the murders was overwhelming. Thus, Jenkins failed to establish actual prejudice and his motion for a mistrial (Dkt. 1141) was denied.

### Filip Caruso's Extraneous Comment

Pirk moved for a mistrial on the basis of remarks made by former KMC member and co-defendant Caruso, a Government witness who was in United States Marshals

Service ("USMS") custody. (*See* Dkt. 1174). While Caruso testified from the witness stand, a USMS Deputy was seated in a chair located below the witness stand and near the jury box. Caruso apparently noticed that the Deputy Marshal had either been sleeping, on his phone, or not paying attention during Caruso's testimony. During a scheduled break in Caruso's direct testimony, Caruso commented to the Deputy Marshal, in sum and substance, as follows: "Shouldn't you be watching me? I could kill them." (Dkt. 1174 at ¶ 7; Dkt. 1181 at 2). To place the statement in context, Caruso provided answers to questions during his testimony that, at times, caused many individuals in the courtroom (including defense counsel) to laugh.[4]

Juror #5 reported the comment to the Court's staff. With the consent of all counsel, the Court then individually questioned the jurors who may have heard the comments—Juror #5, Juror #1, Juror #12, Juror #10, Juror #11, and Juror #2 (in that order). Each of those jurors disclosed what, if anything, he or she heard Caruso say, along with their observations of Caruso or the Deputy Marshal.[5] Jurors #1, #10, and #12 heard the comment, and Juror #5 heard Jurors #1 and #12 discuss the comment. Juror #2 and Juror #11 overheard Caruso say something but were unsure what Caruso said. The jurors

---

[4] In that regard, the Court agrees with the Government's statement in response to the motion for a mistrial, that context is important: "Filip Caruso was making a wise-crack type comment to the sleepy Deputy U.S. Marshal. The comment, albeit stupid, was made in jest and was in no way a 'true threat' and in no way was directed at the defendants on trial." (Dkt. 1181 at 3 n.1). For that matter, the comment was not directed at anyone in the courtroom other than the Deputy Marshal who Caruso concluded was not doing his job.

[5] The trial transcript of this portion of the trial has not been filed. The recitation contained herein is based on the Court's notes, but if the certified transcript differs in any respect, it obviously controls.

explained that generally speaking their primary concern was that the Deputy Marshal was sleeping or not paying attention. The Court admonished the jurors individually and as a group, directing them to raise any concerns that they had with the Court rather than each other. In addition, the Court confirmed that each of the jurors could continue to be fair and impartial, and instructed the jurors that evidence comes from testimony and evidence properly admitted while the trial is in session, not from any other sources. The Court separately admonished Caruso to only answer questions asked by the attorneys and to not to make any unsolicited remarks.

Pirk moved for a mistrial based on Caruso's extraneous comment. (Dkt. 1174). In Pirk's view, a mistrial was necessary because Caruso's unsolicited comment was "an extraneous factor, which is not a proper consideration for the jury." (*Id.* at ¶ 8). He pointed out that the jurors might have believed Caruso's comment was a joke and that an actual murderer would not make that joke, thus undermining the defense if the jurors then credited Caruso's testimony[6]; on the other hand, the jurors might have taken Caruso's statement literally and believed he was capable of murder, which would be detrimental to the Government's case. (*Id.* at ¶¶ 7-8). Pirk also contended that the incident revealed that certain jurors had disregarded the Court's admonitions not to discuss the trial among

---

[6]    From the opening statements, Defendants attempted to portray Caruso as the real killer. This tactic was undermined by Caruso's testimony because he generally came off credibly and he denied any involvement in the murders. Thus, while Caruso's testimony was harmful to the defense because of its content, his offhanded and inappropriate remark to the Deputy Marshal during a break in the proceedings did not similarly prejudice Defendants.

themselves, and no curative instruction could have erased the taint resulting from the comment. (*Id.* at ¶¶ 10-11).

The Government opposed Pirk's motion, arguing that the incident did not prejudice the defense in any way. (Dkt. 1181 at 2). The Government argued that if any party was prejudiced, it would have been the Government, but the Court took reasonable steps to address the incident by questioning each individual juror who potentially heard the comment; asking counsel whether any additional questions or jurors should be questioned; admonishing the jurors as a group and ensuring that they could continue to be fair and impartial; admonishing Caruso to not speak or make any extraneous comments, and to stop with the wise-cracks; and explaining to the jurors that evidence does not include any sources outside properly admitted testimony and exhibits. (*Id.* at 3).

No mistrial was warranted as a result of Caruso's extraneous comment. Caruso's comment did not create a "manifest" or "high degree of necessity" warranting a mistrial. *Renico*, 559 U.S. at 774. First, Pirk failed to establish actual prejudice from Caruso's extraneous comment; instead, at most, it might have hurt the Government's theory of the case by suggesting that Caruso is violent and committed the murders, or alternatively (and more likely) that this Government witness was joking in an inappropriate manner.

Second, no mistrial was warranted in light of the remedial steps that the Court took after the jurors reported Caruso's comment. The Court individually questioned each of the jurors who either heard Caruso's comment or heard of it. The Court also confirmed with the entire jury that they would remain fair and impartial, reminded them of their obligations as jurors, and repeated its instruction that the evidence consists of the testimony of

witnesses, documents, and other items received into the record as exhibits, not information or sources not admitted into evidence. The Court also admonished Caruso not to speak unless the lawyers or Court prompted him to do so. Taken together, those actions cured any prejudice that may have resulted from Caruso's extraneous comment. *See, e.g., Butler v. Kibel*, 513 F. App'x 10, 11 (2d Cir. 2013) (finding no abuse of discretion in denial of motion for a mistrial where the district court took appropriate steps to cure any possible taint from jury reviewing transcripts containing district court's remarks disparaging counsel; specifically, the district court instructed the jury to disregard the transcripts and polled the jury to ensure they followed the instruction); *United States v. Kaid*, 241 F. App'x 747, 751 (2d Cir. 2007) (finding no abuse in denial of motion for a mistrial where the court struck certain evidence from the record and instructed the jury to disregard it). The Court will "normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant." *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (internal quotation marks and citations omitted); *see also Zafiro v. United States*, 506 U.S. 534, 540-41 (1993) (holding that jurors are presumed to follow instructions absent an indication that they have not done so). In the absence of any indication that the jury was unable to follow the Court's instruction, the Court presumes that the jury did adhere to its instruction to disregard Caruso's comment and consider only the evidence in the case. For these reasons, no mistrial was warranted.

### Uncalled Government Witnesses

On May 13, 2018, Jenkins moved for a mistrial based upon statements made by the Government during its opening statement with respect to two potential witnesses who ultimately were not called to testify—Adam Hamilton ("Hamilton") and Raysean Clark ("Clark"). (Dkt. 1245). In its opening statement that lasted almost three hours, the Government told the jury about Jenkins being at Hamilton's house the night before the murders:

> [Jenkins] showed up at Adam Hamilton's house because he learned where he lived the night before. And you'll hear they had Kentucky Fried Chicken and some sort of awkward dinner where Jenkins had his gun inside Hamilton's house, and his wife and kids were there, and Hamilton will explain to you, he wanted him out and made up an excuse and said, "I have to go to a meeting and you have to go." So Jenkins went on his way and brought Rene. They didn't know where else to go so they went to Betty's.

(Dkt. 1245-1 at 60). The Government also told the jury about Jenkins' interaction with Hamilton a few days before, on September 4, 2014, at Cocktail Bob's, a bar in Niagara Falls:

> At the bar, Jenkins is positioning himself as he is out of the Kingsmen. As he starts drinking, he almost blows his own cover. He does a shot at the bar and Hamilton had seen the gun and knew Jenkins was armed and they did a shot at the bar and Jenkins saluted, LKDK to Hamilton, "live a Kingsmen, die a Kingsmen." Well, Hamilton took offense to that. He is now hanging out with a different organization, that was disrespect saluting LKDK.

(*Id.* at 56-57). The Government also told the jury that Jenkins befriended Clark while in jail:

> Jenkins, who befriended an individual in jail named Raysean Clark, they got to know each other playing chess, said to Raysean Clark, "Everyone knows I killed them, I did it for the National President, the national boss." And Raysean Clark will explain to you how fully committed and loyal Defendant

Jenkins is to Defendant Pirk, based on their conversations together. That is the conspiracy.

(*Id.* at 80).

The Government called neither Hamilton nor Clark as witnesses. With respect to Hamilton, the Government explained that it had intended to call him but the weekend before he was going to testify, he was arrested and the Government suspected he was using drugs. Hamilton was not called at that time, but then the Government planned to present his testimony later in the case, but ultimately elected not to do so for several reasons that were explained on the record[7], including the fact that Hamilton was exceedingly nervous about his testimony (repeatedly telephoning the agents crying about the prospect of testifying).

As for Clark, the proposed final witness to be called by the Government, the prosecution decided not to call him as a witness after an issue arose as to whether the use of Clark's testimony would violate the rule set forth in *Massiah v. United States*, 377 U.S. 201 (1964), and whether the Court would be required to hold an evidentiary hearing outside the presence of the jury.

Jenkins argued that a mistrial was necessitated because the Government told the jury about Hamilton and Clark in its opening statement but ultimately called neither of those witnesses. (Dkt. 1245). In Jenkins' view, that rendered the Government's opening

---

[7] While the transcript of the Government's opening statement was prepared and filed on the docket, the other portions of the trial referenced in this part of the Decision and Order have not yet been filed; therefore, as with the other portions of this Decision and Order, if the certified transcript differs in any way from the Court's recitation of the events at trial, the transcript obviously controls.

- 15 -

statement improper, and "the highly prejudicial nature of the Government's opening statements regarding Mr. Clark and Mr. Hamilton, and subsequent failure to support such statements at trial" required a mistrial. (*Id.* at ¶ 15). The Government opposed Jenkins' motion.

The fact that the Government referenced Hamilton and Clark in its opening statement and later declined to call them as witnesses did not warrant a mistrial. As an initial matter, the references to Hamilton and Clark were a miniscule part of the Government's opening statement—a statement that likely was a distant memory to the jurors once they began their deliberations months later. Moreover, the Court repeatedly instructed the jury throughout the trial that the statements of lawyers are not evidence; rather, the evidence consists of the testimony of witnesses, documents, and other items received into the record as exhibits. Accordingly, the Government's opening statement was not evidence, and the jury is presumed to have followed the instruction to that effect. *See Greer*, 483 U.S. at 766 n.8; *see also Zafiro*, 506 U.S. at 540-41; *United States v. Badalamenti*, 794 F.2d 821, 829 (2d Cir. 1986) (while prosecutor's comments during opening statement may have been inappropriate, the trial judge repeatedly instructed the jury that comments by counsel were not evidence and, therefore, defendants were not deprived of a fair trial). The Government's opening statement thus did not create a "manifest" or "high degree of necessity" warranting a mistrial. *Renico*, 559 U.S. at 774. *Cf. United States v. Wilkinson*, 754 F.2d 1427, 1435 (2d Cir. 1985) ("The test is whether the statements, viewed against 'the entire argument before the jury,' deprived the defendant of a fair trial." (internal citations omitted)).

Jenkins relies on *United States v. Millan*, 817 F. Supp. 1086 (S.D.N.Y. 1993) in support of his motion for a mistrial (Dkt. 1245 at 3-4), but the circumstances of *Millan* are far different than those present here. In *Millan*, the district court declared a mistrial, citing several reasons. First, the Government suggested to the jury in its opening statement that one of the investigating agents was a credible, reliable witness, yet it was discovered that the agent had been arrested for narcotics trafficking before the opening statement took place. *Id.* at 1088-89. The Government decided not to call that agent as a witness. *Id.* at 1088. Second, during the trial, it came to light that between $50,000 and $80,000 that another investigating agent had seized during the arrest of one of the defendants in the case had gone missing. *Id.* at 1087-88. Concerned that "the entire vouchering process in th[e] case [wa]s now suspect," *id.* at 1089, that "future inquiries [may] reveal additional instances of misconduct affecting th[e] case," *id.*, and that alternatives to a mistrial were impractical, the Court declared a mistrial. *Id.* at 1090.

Circumstances that were comparably prejudicial to the defense were not present in the instant case. Moreover, although "the prosecutor may not refer to evidence which will be inadmissible or unsupported at trial," *id.* at 1088, the Court never determined that the testimony of Hamilton or Clark would be inadmissible at trial. In fact, it was because of Defendants' objections to Clark and the delay that would result from any evidentiary hearing that the Government elected not to call Clark. There is absolutely no proof that the Government acted in bad faith in mentioning Hamilton and Clark during its opening, but ultimately electing not to call them. Moreover, the proffered evidence concerning Jenkins' activities while in the Buffalo area in September 2014, leading to the murders on

September 6, 2014, was elicited through other witnesses who testified in the case. *See United States v. Chu*, 183 F. App'x 94, 97-98 (2d Cir. 2006) (district court properly denied defendant's motion for mistrial based on prosecution's opening statement where certain evidence was previewed that was not in fact produced; the content of the evidence was cumulative of other evidence and the government did not act in bad faith).

Accordingly, the Government's decision not to call Hamilton and Clark as witnesses, despite its opening statement, did not prejudice Defendants or warrant a mistrial.

## **CONCLUSION**

For the reasons previously stated on the record and set forth above, Defendants' motions for a mistrial (Dkt. 1141; Dkt. 1174; Dkt. 1245) are denied.

SO ORDERED.

_____
ELIZABETH A. WOLFORD
United States District Judge

Dated: February 5, 2019
      Rochester, New York